UNITED STATES of America, Appellee,

v.

**Axel URBANIK, Appellant.**

**No. 85–5531.**

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1986.

Decided Sept. 23, 1986.

---

James A. Rothschild, Baltimore, Md., for appellant.

Robert C. Bonsib, Asst. U.S. Atty. (Catherine C. Blake, U.S. Atty., Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, and RUSSELL and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Axel Urbanik appeals his conviction of conspiracy to distribute and to possess with intent to distribute marijuana and cocaine. Urbanik challenges the sufficiency of the evidence to support his conviction of a conspiracy occurring within the applicable statute of limitations, and also contends that the district court erred in admitting, as nonhearsay, a coconspirator statement that was not "in furtherance" of the conspiracy as required by Fed.R.Evid. 801(d)(2)(E). Because we conclude that the co-conspirator evidence was improperly admitted, and that the error was not harmless, we reverse Urbanik's conviction and remand for a new trial.

## I

Axel Urbanik was indicted on July 11, 1984, and the superseding indictment upon which he was tried charged him with conspiracy to distribute and possession with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 846 (1982), as well as a violation of the Travel Act, 18 U.S.C. § 1952 (1982). Count I of the indictment charged that Urbanik was a member of a drug conspiracy, during the period 1978 to 1983, that included, among others, Ernie Pelino, Steven Smith, Lloyd Furman, Lent Hunter, Richard Holzworth, Harry Bevans, Lynn Smith, Paul Kuntz, Robert George, and Michael Haselhuhn. Count IV charged that Urbanik and Pelino caused Holzworth to travel in interstate commerce in aid of a racketeering enterprise in violation of 18 U.S.C. §§ 2, 1952. A jury convicted Urbanik of the conspiracy charges contained in Count I, but acquitted him of

the Travel Act offense charged in Count IV.

The Government's witnesses at trial included four individuals named in the indictment as co-conspirators. Harry Bevans testified that he met Urbanik in Florida in 1978, and dealt with him four or five times in 1978 and 1979. Bevans stated that Urbanik worked with Jack Devereaux, and that he regularly purchased marijuana from Urbanik and Devereaux. Bevans testified that he last saw Urbanik in early 1979.

Richard Holzworth testified that he had known Pelino since 1969, that he had begun to transport and distribute drugs for Pelino in early 1979, and that his last involvement in drug trafficking was in late July or early August 1979. He stated that he dealt with Devereaux on his trips from Maryland to Florida for Pelino, and that Devereaux and Pelino introduced Urbanik to Holzworth as Devereaux's partner. On one trip, Holzworth indicated, Urbanik told him that Devereaux was involved with undercover agents, and that he should therefore deal only with Urbanik. He testified that on May 30, 1979, he purchased 100 pounds of marijuana from Urbanik, and that he conducted several other deals with Urbanik before ending his involvement in late July 1979. In an earlier statement to a Drug Enforcement Administration agent, Holzworth had stated that his final trip to Florida to meet with Urbanik occurred in either June or July 1979, but at trial Holzworth testified unambiguously that the last trip took place in late July 1979. He testified that on that trip, he purchased cocaine from Urbanik at Key West. Holzworth said that he remembered the trip because he combined it with a trip to visit family in Baton Rouge. Holzworth's credit card records showed a June 11 trip from Baton Rouge to Key West, but no other record of such a trip.

Lent Hunter testified that he purchased marijuana from Pelino between 1979 and 1982, either directly or from Pelino's dealers, including Holzworth.

Michael Haselhuhn had been purchasing cocaine from Bevans in late 1979 or early 1980 when he met Pelino, who undercut Bevans' price and began to supply Haselhuhn. Haselhuhn testified that until March 1981 he purchased cocaine and marijuana from Pelino on numerous occasions. After a hearing out of the jury's presence, Haselhuhn was permitted to testify about statements made to him by Pelino in the summer of 1980. At the time of the statements, Haselhuhn was at Pelino's house to pay for some drugs and obtain a new supply. He testified that after concluding their business, he and Pelino were engaging in casual conversation about weight-lifting, and using Pelino's weight-lifting equipment. In the course of discussing their own abilities, Pelino told Haselhuhn about a "friend in the Keys" named Axel from whom he obtained marijuana "at 1,000 pounds a clip" who was "a little short guy" but could bench press 300 pounds. The statements from Pelino to Haselhuhn were admitted under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E).

Special Agent William Athas of the Drug Enforcement Administration testified that in February 1984, he traveled with Holzworth to Urbanik's gym in Key West. In response to a request by Holzworth that Urbanik sell him drugs, Athas testified that Urbanik indicated he was "out of the business" of dealing in drugs, and had left the business because it had become "too dangerous." A number of defense witnesses also testified. Lynn Smith testified that in mid-1979, he attempted to contact Devereaux, reached Urbanik, and was told by Urbanik that there was no longer a partnership. Lloyd Furman, who had been named in the indictment as a co-conspirator, testified that he had met Urbanik while in Key West to obtain drugs, but that he did not know of any involvement by Urbanik in any drug distribution activities. Eric Adamson, who had dealt with Pelino, and had met Urbanik in Key West, also testified that he did not know of any drug involvement on the part of Urbanik. Urbanik's wife, who had known him since December 1979, testified that she had never seen her husband distribute cocaine or marijuana, and had never heard him discuss drugs.

Urbanik testified that his only involvement in drugs occurred when he introduced Devereaux to a marijuana dealer in 1977 or 1978, and when he introduced Holzworth to a marijuana dealer in 1979. He testified that his relationship with Pelino was limited to their weight-lifting activities.

Upon conviction of the offenses of conspiracy to distribute and possession with intent to distribute marijuana and cocaine, Urbanik was sentenced by the district court to a term of incarceration of four years. This appeal followed.

## II

Urbanik first contends that the evidence at trial was insufficient to support a jury finding that he was involved in a single conspiracy taking place within the applicable statute of limitations. Because Urbanik was indicted on July 11, 1984, the five-year statute of limitations, 18 U.S.C. § 3282 (1982), permitted Urbanik to be prosecuted only for acts occurring subsequent to July 10, 1979. Urbanik argues that the evidence at trial proved multiple conspiracies, rather than the single conspiracy for which he was indicted, and contends that, in any event, the evidence did not permit a finding that he was involved in a conspiracy after July 10, 1979. We reject both arguments.

■ Although it is improper to charge a single conspiracy when multiple conspiracies exist, *see Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the question whether the evidence shows a single or multiple conspiracies is for the jury. If the jury is properly instructed, the finding of a single conspiracy must stand unless the evidence, taken in the light most favorable to the government, would not allow a reasonable jury so to find. *See United States v. Brito*, 721 F.2d 743, 747 (11th Cir.1983); *United*

*States v. Holland,* 494 F.Supp. 918, 922 (D.Md.1980).

■ A review of the evidence demonstrates that a jury could properly find the existence of a single conspiracy. Although there was evidence that Pelino and other distributors who purchased cocaine and marijuana from Devereaux also used other suppliers, that not all those who had dealings with Urbanik were acquainted with each other, and that not all of those who worked for Pelino in Maryland had met or even knew of Urbanik's involvement, the evidence, viewed in the light most favorable to the government, yet supports a finding of a single conspiracy. The principals may have performed their roles at different points in the distribution network, but the evidence suffices to support the inference of a single large conspiracy the object of which was the wide-scale possession and distribution of marijuana and cocaine. The jury was properly instructed that it might find a single conspiracy, separate conspiracies not charged in the indictment, or no conspiracy at all, and that they must convict Urbanik only upon their finding that he was a member of the single conspiracy charged in the indictment. That verdict was adequately supported by the evidence.

## II

■ Urbanik next argues, however, that because there was no competent evidence to support a finding that he was still involved in the conspiracy after July 10, 1979, he was entitled to acquittal on the conspiracy count of the indictment. He suggests that the only competent testimony showing his participation in the conspiracy after the relevant date was that of Holzworth about his purchase of cocaine from Urbanik in Florida in late July 1979. Because that transaction was the subject of the Travel Act violation for which Urbanik was acquitted, Urbanik reasons that the jury disbelieved Holzworth's testimony that the transaction took place in July, rather than June. If the transaction took place in June, and if the Haselhuhn testimony that Pelino told him in 1980 that Urbanik was his marijuana supplier was improperly admitted, as Urbanik also argues, Urbanik then claims that there was no competent evidence upon which the jury could base a finding of guilt as to Count I of the indictment, so that he is entitled to a judgment of acquittal.

We disagree. Assuming its competence, the evidence would support the requisite finding of Urbanik's participation in the conspiracy after the relevant date on either of three alternative factual theories.

First, there is the challenged co-conspirator statement testimony of Haselhuhn. If believed, it obviously would support a jury finding that Urbanik was still actively supplying Pelino in 1980.

Next, although Urbanik was acquitted of the Travel Act offense, it does not follow of necessity that the jury rejected Haselhuhn's testimony that he purchased cocaine from Urbanik in late July 1979. The jury was instructed that they could only convict Urbanik of the Travel Act violation if they found not only that Holzworth bought cocaine from Urbanik in late July or early August 1979, but also that the interstate travel involved in that transaction was part of a continuing course of conduct, and not an isolated incident, that the cocaine distribution was the dominant purpose of the travel, and that the controlled substance whose distribution was furthered by the travel was cocaine. Because the testimony with regard to this incident was limited to the single purchase of cocaine by Holzworth, the verdict of acquittal on the Travel Act count may well have reflected a finding by the jury that there was no continuing course of conduct, and is not necessarily a finding that the transaction did not take place in late July. If the jury concluded that the transaction did take place in late July, Urbanik could properly have been convicted of membership in the conspiracy within the limitations period notwithstanding his acquittal on the Travel Act violation.

Finally, the evidence would support conviction on the theory that, without regard

to any proof of overt acts after July 10, 1979, Urbanik had not withdrawn by that date from the conspiracy of which he was once demonstrably a member. The evidence clearly supported a finding that at one point Urbanik was a member of a conspiracy that began in 1978 and continued into 1982. The jury was properly instructed that a conspirator's membership in a conspiracy continues until he withdraws from the conspiracy by affirmative action. *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 318–19 (4th Cir.1982); *Joyner v. United States*, 547 F.2d 1199, 1203 (4th Cir.1977). The jury was told that it was the obligation of Urbanik to produce evidence of withdrawal, and that if it found that such evidence had been produced, the burden was upon the government to prove beyond a reasonable doubt that Urbanik had not withdrawn.

■ Withdrawal must be shown by evidence that the former conspirator acted to defeat or disavow the purposes of the conspiracy, *see United States v. Killian*, 639 F.2d 206, 209 (5th Cir.1981), and Urbanik was burdened to produce evidence of withdrawal in order to require submission of the issue. *United States v. Bradsby*, 628 F.2d 901, 905 (5th Cir.1980). Assuming that he carried the burden, the issue then was clearly one for the jury. Given the ambiguous nature of Urbanik's evidence on the point, there was ample evidence from which the jury could have concluded beyond a reasonable doubt that Urbanik never acted affirmatively to withdraw before the critical date. This would suffice to support the conviction without regard to whether the jury accepted Holzworth's testimony of an overt act in July 1979, or Haselhuhn's testimony of Pelino's statement affirmatively suggesting continued membership in 1980.

We therefore conclude that there was sufficient evidence from which, on one or more of three factual theories, the jury could properly have found Urbanik to have been a member of the charged conspiracy within the limitations period.

## IV

There remains, however, the question whether the evidence supporting one of the factual theories—Haselhuhn's testimony of a co-conspirator's statement suggesting active participation in 1980—was properly admitted, and, if it was not, whether its admission was nevertheless harmless error.

Because Pelino's 1980 comments that "Axel" was Pelino's supplier occurred during a discussion with Haselhuhn about weight-lifting, Urbanik posits that they were not statements of a co-conspirator "during the course of and in furtherance of the conspiracy," and that therefore the statements were not admissible as non-hearsay under Fed.R.Evid. 801(d)(2)(E).

Rule 801(d)(2)(E) permits a statement of a conspirator to be admitted against other conspirators as if it were the admission of the parties themselves. The rule defines such statements, as it does other admissions by parties, as non-hearsay. The "agency fiction" that allows the statements of conspirators to be imputed to co-conspirator defendants is limited, however, by the requirement that statements be admitted under this rule only if they are made both "in the course of and in furtherance of the conspiracy." Urbanik contends that the challenged evidence failed to comply with either of these requirements.

■ Because a co-conspirator's statement must be "in the course of" a conspiracy before it may be admitted under Rule 801(d)(2)(E), it is necessary that the government establish a foundation for the admission of such testimony by adducing independent evidence that at the time the statement was made, there existed a conspiracy of which the defendant was a member. *See United States v. Robinson*, 707 F.2d 811, 813 (4th Cir.1983); *United States v. Stroupe*, 538 F.2d 1063, 1065 (4th Cir.1976). We conclude that, in this case, there was adequate independent evidence of the existence of the conspiracy and of Urbanik's participation in it. There was, as we found above, evidence that Urbanik was involved as a supplier in a conspiracy to distribute

and to possess with intention to distribute marijuana and cocaine. There was also a dispute about whether Urbanik had effectively withdrawn from the conspiracy at the time Pelino made the relevant statements to Haselhuhn. Because the question of withdrawal was for the jury, the district court did not err in concluding that there was sufficient evidence to admit the statements of Pelino as occurring "in the course of" the conspiracy.

■ We are not similarly persuaded, however, that the statements by Pelino to Haselhuhn were made "in furtherance of" the conspiracy. In the voir dire preceding his testimony, Haselhuhn indicated that at the time of the statements, he and Pelino were lifting weights at Pelino's home in Maryland. Although Haselhuhn had come to Pelino's house to pay for and pick up cocaine, that business had, by Haselhuhn's testimony, been concluded before the weight-lifting discussions. In the course of talking about weight-lifting and the making of comparisons about their weight-lifting abilities, Pelino described a friend, named Axel, who despite his small size could bench press 300 pounds. Along with his description of Urbanik as "a little short guy" who could lift a lot of weight, Pelino described Urbanik as his "connection in Florida for pot," who supplied him at "a thousand pounds a clip." Haselhuhn's testimony was that when the statements were made, Haselhuhn and Pelino were just "hanging out" and "shooting the breeze" about weight-lifting.

The government argues that we should construe the "in furtherance" requirement of Rule 801(d)(2)(E) broadly. Because the 1980 meeting between Haselhuhn and Pelino was initiated for the purpose of obtaining and paying for drugs, and because Pelino and Haselhuhn had an ongoing supplier-purchaser relationship, the government urges that Pelino's statement identifying Urbanik as his marijuana source must be considered to have been "in furtherance of" the conspiracy. We disagree. Although Pelino's statements inferentially identified Urbanik as a supplier of drugs in

1980, we think that it could not fairly be ruled that the identification was made "in furtherance of the conspiracy" charged. The statement identifying Urbanik as Pelino's "connection" for marijuana was merely a casual aside to the discussion of Urbanik the weight-lifter. In no sense but a most speculative one could it be thought to have been made to further the purposes of the conspiracy. Haselhuhn himself testified that this identification of Pelino's marijuana supplier could have had no effect on the conspiratorial relationship between him and Pelino. We think that this statement can fairly be treated only as the sort of idle conversation which though it touches upon, does not "further," a conspiracy, and which accordingly should not be admitted under Rule 801(d)(2)(E). *See United States v. Means*, 695 F.2d 811, 818 (5th Cir.1983); *United States v. Lieberman*, 637 F.2d 95, 102 (2d Cir.1980); *United States v. Eubanks*, 591 F.2d 513, 520 (9th Cir.1979).

> The requirement that the statements have been in furtherance of the conspiracy is designed both to assure their reliability and to be consistent with the presumption that the coconspirator would have authorized them.... The requirement is not satisfied by a conversation ... which amounted to no more than idle chatter.

*Lieberman*, 637 F.2d at 103 (citation omitted).

Moreover, we think that in total context of the record, the error in admitting these hearsay statements of the co-conspirator Pelino cannot be considered harmless under Fed.R.Crim.P. 52(a).

■ The proper test of harmlessness of nonconstitutional error is whether we, in appellate review, can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). In applying this test, we must be mindful that it does not ask simply whether we believe that irrespective of the error there was sufficient untainted evidence to convict

but, more stringently, whether we believe it "highly probable that the error did not affect the judgment." *United States v. Nyman,* 649 F.2d 208, 212 (4th Cir.1980) (quoting Traynor, *The Riddle of Harmless Error* 34–35 (1970)).

Thus, it does not suffice here simply to point to the fact that, as we have earlier concluded, there was sufficient untainted evidence to support the conviction without resort to the Haselhuhn testimony. A proper assessment must go beyond this and consider the "closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Nyman,* 649 F.2d at 212 (quoting *Gaither v. United States,* 413 F.2d 1061, 1079 (D.C.Cir.1969)).

█ Here, there were obviously no steps taken to mitigate an unacknowledged error, so that inquiry must focus on the factors of closeness and centrality. As to these, the issue of course was central: whether Urbanik was a member of the conspiracy after July 10, 1979. This factor therefore also militates against finding the error harmless. This leaves the closeness of the issue, which is the single most important factor, because it provides the central safeguard against reversals for purely "technical" error.

Appellate assessment of the "closeness" of an issue as it probably appeared to a jury is of course a highly judgmental process, involving much more of feel than of science. While assessing closeness necessarily requires looking to the probative force of other evidence tending to prove the issue, that, as earlier indicated, is not for the purpose of determining whether, if independently considered, that evidence would have sufficed to convict. The inquiry into "closeness" instead involves assessing whether the other evidence is not only sufficient to convict, but whether it is sufficiently powerful in relation to the tainted evidence to give "fair assurance" that the tainted evidence did not "substantially sway" the jury to its verdict.

Here, applying this test, we conclude that the issue was sufficiently close to prevent finding this error harmless. As indicated, the jury had two other factual bases upon which it could have found against Urbanik on the critical issue: that Urbanik engaged in an overt act with Holzworth in late July 1979 and that in any event he did not affirmatively withdraw in time from the proven conspiracy. Our assessment is that the evidence supporting those other possible bases for conviction was simply not powerful enough to make this central issue not a "close" one. We are not sufficiently assured that the tainted evidence—in some ways the most telling—that Urbanik positively continued his membership in the conspiracy after July 1979, did not substantially sway the jury in reaching its verdict. The evidence of the timing of Urbanik's 1979 dealing with Holzworth was confused and disputed. The evidence of Urbanik's nonwithdrawal, in the face of his evidence of withdrawal, was certainly not overpowering; indeed it depended in part upon the very evidence of his continued 1980 involvement with Pelino.

We therefore think that the issue as it went to the jury was necessarily so close that admission of the tainted evidence cannot be deemed harmless. On this basis we conclude that Urbanik is entitled to a new trial.

REVERSED AND REMANDED FOR NEW TRIAL.

DONALD RUSSELL, Circuit Judge, dissenting:

I dissent from that part of the majority opinion which reverses on the ground that the co-conspirator Pelino's 1980 statement was erroneously admitted at trial and that such admission was not harmless. I would find the statement admissible and, were it, despite this view, to be held inadmissible, I would find its admission harmless.

The majority opinion agrees that there was sufficient evidence to establish that Pelino and the appellant Urbanik were engaged in a drug conspiracy and that Urbanik was still a member of that conspiracy at the time he made the statement which the majority finds inadmissible. The challenged statement was made by Pelino while Haselhuhn, who was a drug distributor ob-

taining in part his supplies from Pelino, was at Pelino's gym, where apparently Pelino handled his drug operations, for the purpose of paying for and picking up cocaine. Both Haselhuhn and Pelino were weightlifters. After Haselhuhn had paid for the cocaine, he and Pelino had a conversation in Pelino's weightroom. They unquestionably talked about weightlifting at the time and about weightlifters. Pelino told Haselhuhn that there was an expert weightlifter in Florida, who supplied him "pot" at a "thousand pounds a clip." In this statement, Pelino identified Urbanik as a weightlifter but he also identified to his customer that this weightlifter was his source for controlled materials. This statement was made by Pelino to an individual who shared a common interest with him both in weightlifting and in the availability of drugs. The majority would treat this statement between the two as one relating only to weightlifting and would treat the fact that Pelino was simultaneously indicating to his customer that this weightlifter represented an ample source for him to supply the customer with controlled materials as mere innocent chatter without purpose or intention to influence Haselhuhn in continued purchases of controlled materials from him (Pelino). I do not think it is for us to assume that Pelino was not intending by this statement to impress on his customer that he had in Florida a supplier of drugs who could meet any requirement, even a "thousand pounds (of marijuana) at a clip" and that Haselhuhn could confidently rely on him (Pelino) to supply him (Haselhuhn) with his requirements of marijuana or other drugs; that is a question to be resolved by the jury.

Haselhuhn was not at Pelino's gym to discuss weightlifting or to exercise; he was there to carry out a transaction in drugs. Any conversation about weightlifting was the idle chatter; the real interest of the parties was in drugs and marijuana and their availability. And it can be inferred that Pelino was using the subject of weightlifting to provide him with an opportunity to emphasize his access to a substantial source and to assure Haselhuhn of his ability to supply material easily through his Florida source. If Pelino had intended his conversation to be strictly limited to weightlifting as the majority concludes, there would have been no reason for him to add the significant statement that this other individual was one of his suppliers and, more than that, a large one who could make delivery of substantial amounts "at a clip." If, however, the purpose of the added statement was to induce Haselhuhn to continue dealing with Pelino for drugs—and that could be a reasonable inference—then the statement would have been in clear furtherance of the conspiracy. Whether that was its purpose was—in my opinion—a question for the jury.

Finally, even if the statement could be considered inadmissible, I do not think its admission could be regarded other than as harmless in view of the overwhelming evidence of Urbanik's guilt.