849 F.2d 607
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Stephen Samuel MILLER, Defendant-Appellant,
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Eugene JACKSON, Defendant-Appellant,
UNITED STATES of America, Plaintiff-Appellee,
v.
Stephen Samuel MILLER, Defendant-Appellant.
 Nos. 87-5106, 87-5111 and 87-5202.
 United States Court of Appeals, Fourth Circuit.
 Argued: Feb. 2, 1988.
Decided: June 7, 1988.
 
 Before DONALD RUSSELL, WIDENER and CHAPMAN, Circuit Judges.
 Ray Colton Vallery; Ronald Douglas McSwain (Boose & McSwain, on brief), for appellants.
 Irving Gornstein, Department of Justice (William Bradford Reynolds, Assistant Attorney General; John Douglas McCullough, Acting United States Attorney; Jessica Dunsay Silver, Department of Justice, on brief), for appellee.
 PER CURIAM:
 
 
 1
 Stephen Samuel Miller appeals his convictions of conspiracy in violation of 18 U.S.C. Sec. 371 (1982); to possession of a .22 caliber rifle, which had been altered to fire automatically and was not registered to him as required by law, in violation of 26 U.S.C. Sec. 5861(d) and Sec. 5871 (1982); and making a firearm silencer without having received an approved application to make the same as required by law, in violation of 26 U.S.C. Sec. 5861(f) and Sec. 5871 (1982).
 
 
 2
 Robert Eugene Jackson appeals his conviction of the same conspiracy claiming error because he was arraigned and tried in his absence. Both appellants claim that their trials should have been severed, that the evidence was not sufficient to support any of their convictions, and that the trial judge erred in the admission of a model of the automatic rifle and the silencer rather than the originals.
 
 
 3
 We affirm the convictions of Miller, but we remand the Jackson case to the district court for a finding on the issue of whether appellant Jackson knowingly and voluntarily waived his rights to be present at his arraignment and his trial.
 
 
 4
 * The indictment charges that the appellants Miller and Jackson conspired with their co-defendants Anthony Todd Wydra, Wendell Lee Lane and Simeon Davis, along with other indicted and unindicted co-conspirators, to steal military weapons, explosives, and equipment from the United States to be used by a group within the White Supremacist Movement, known as the Carolina Knights of the Klu Klux Klan and its successor, the White Patriot Party in connection with the maintenance, training and equipping of a paramilitary armed force to further the goals of the White Supremacist Movement. Various overt acts were alleged beginning in early 1984 and continuing until September 1986.
 
 
 5
 Prior to trial, Wendell Lee Lane and Simeon Davis pled guilty to the conspiracy count. At trial Anthony Todd Wydra was found not guilty. Both Miller and Jackson were convicted of conspiracy and Miller was convicted of the two additional counts involving the automatic .22 caliber rifle and the silencer.
 
 
 6
 Miller, Jackson, Wydra, Lane and Davis were all associated with the Carolina Knights of the Klu Klux Klan and its successor, the White Patriot Party. Miller was second in command of the group and its purpose was to overthrow the government of the United States and to establish a all-white nation. To pursue their revolution, it was necessary for these individuals to secure and stockpile weapons, ammunition and equipment. Miller provided military training to the group.
 
 
 7
 In early 1984 Jackson and Wydra met Robert Jones who was engaged in acquiring and selling weapons and other military equipment. They introduced Jones to Steven Miller, and thereafter Jones agreed to secure arms and explosives for the group. The weapons were to be sold to Steven Miller and explosives were to be sold to one Doug Sheets. In the ensuing months Jones sold a number of AR-15 rifles to Miller and certain explosives to Sheets. Jones also sold AR-15s to Jackson, Wydra and Sheets. The ATF Forms 4473 Jones used in reporting the sales were completed so as to not list these individuals as the purchasers.
 
 
 8
 In May 1985 the Wadesboro Armory was robbed and certain military equipment, including night vision scopes, some M-16 magazines, gas masks and webb belts came into the possession of Jones. Jones sold a gas mask to Steve Miller and the M-16 clips to Wydra. Jones advised Miller that this equipment had come from the Wadesboro Armory.
 
 
 9
 During the summer of 1985, Jones arranged to buy a quantity of plastic explosives from one Andy Alexander, who unbeknownst to Jones, was working in an undercover capacity for ATF. Jones advised Sheets that he needed some money to purchase the explosives, but Sheets was out of town and arranged for Miller to give Jones $300 in cash. Jones asked Wydra to act as his "cover" during the transaction and it was arranged that Jones would meet Alexander at Bob's Sandwich Shop, and that Wydra would be there providing cover with an AR-15. On the day of this sale, Jones went to Wydra's house and found Jackson there. Jones advised Jackson that they were picking up some "banging material", and Jackson went along with Jones and Wydra to meet Alexander at Bob's Sandwich Shop. The material was to be delivered in a wooded area nearby. Alexander advised Jones that the explosives were in his car. As Jones and Alexander were leaving the Sandwich Shop, Jones had a conversation with Jackson and then got into Alexander's truck. As Jones and Alexander were leaving the parking lot the truck was stopped and Jones was arrested.
 
 
 10
 After this arrest the federal agents went to the Sandwich Shop to speak with Jackson, but Jackson was not arrested at that time. After being questioned by the agents, Jackson went to the house of Jones to dispose of certain stolen equipment, but he found that the police were already there. When Wydra arrived at the Jones house, Jackson told him to go home and bury any stolen material that he may have. When Jones was released on bail, he met with Jackson and Wydra and they advised him of what had happened after his arrest. They told him that they planned to leave the state because it was getting "a little too warm".
 
 
 11
 The record does not disclose that Jackson had a part in the conspiracy after July 1985. In the spring of 1986, a motion was filed to hold Steven Miller, Glenn Miller and the White Patriot Party in contempt of a prior civil decree in an action brought against the North Carolina Klu Klux Klan and its leader, Glenn Miller, by Morris Dees, Esquire, as attorney for Southern Poverty Law Center. In this prior litigation an injunction prevented the Klan from operating a paramilitary army. Dees followed the activities of the Klan and its successor, the White Patriot Party, and sought the contempt citation when he found that the group had changed its name and was using active duty military personnel for training its paramilitary army and were obtaining military supplies, stolen from the United States Army, in training.
 
 
 12
 During the contempt proceedings Steven Miller was assisted by Simeon Davis, who was assistant leader of the Fayetteville Den of the Klan. This Den was headed by Wendell Lane. At this time there was discussion of killing Attorney Dees, but this never materialized.
 
 
 13
 In August 1986 Miller advised Lane and Davis that the Party needed money for additional weapons and ammunition and suggested robbing drug dealers. He gave Lane two books on how to "rip-off drug dealers". About this time Miller was convicted of criminal contempt and was prohibited from associating with members of the White Patriot Party. Miller was concerned that he was being closely watched, so he decided to postpone the plan to rob drug dealers, and in its place he proposed small robberies in which he would not participate. He identified possible targets of a robbery and gave Lane and Davis instructions on how to dress and also gave them a weapon to be used in the robbery. This weapon was a .22 caliber rifle that had been modified to fire automatically in burst of three shots. Miller also attached an empty two-liter Pepsi bottle to the end of the rifle to act as a silencer. Lane and Miller tested the rifle and Lane testified that it operated automatically and that the Pepsi bottle worked well as a silencer.
 
 
 14
 Lane and Davis wanted a third person to help with the robberies and Miller introduced them to Michael Vick. Lane advised Vick that they wanted money for weapons to support their Party and Vick said he could get his hands on a LAWS rocket. This information was passed to Miller. Vick also mentioned the possibility of obtaining a dragon missile and this information was passed to Miller, who stated that he would like to see such a missile passing through Dees' office.
 
 
 15
 A robbery was planned for a Pizza Hut, but prior to the robbery, Lane and Davis were arrested and Vick was revealed as an undercover informant for the Fayetteville Police Department.
 
 II
 
 16
 The appellants claim error in the failure of the district court to grant their motion of severance so as to try appellants Jackson and Miller separately. Jackson contends that while the indictment alleges only one conspiracy beginning in the spring or summer of 1984 and continuing until September 27, 1987, the government proved at least two, and possibly three, conspiracies, and there was no proof that he was associated with Miller or any of the other indicted or unindicted co-conspirators after the arrest of Jones on July 8, 1985. Jackson contends that if there was a conspiracy involving him, it ended with the arrest of Jones in the summer of 1985, and that he was not involved in what he contends were two later conspiracies: one to harm Attorney Morris Dees, and another to raise money for the White Patriot Party by robbing drug dealers and by the planned robbery of the Pizza Hut.
 
 
 17
 The indictment alleges one conspiracy beginning in the summer of 1984 and continuing until September 27, 1986 and alleges that the indicted and unindicted co-conspirators
 
 
 18
 did wilfully conspire with one another to acquire military weapons, explosives, and equipment to be stolen from the United States, in violation of Title 18, United States Code, Section 641, and which were illegal for them to possess in violation of Title 26 United States Code, Section 5861(d).
 
 
 19
 It was part of the plan and purpose of this conspiracy that defendants STEPHEN MILLER, ROBERT EUGENE JACKSON, a/k/a Jack Jackson, ANTHONY TODD WYDRA, a/k/a Tony Jackson, WENDELL LEE LANE, SIMEON DAVIS and their co-conspirators, would obtain military weapons, explosives and equipment that were stolen and/or illegal to possess for the White Supremacist Movement, the Carolina Knights of the Klu Klux Klan and its successor, White Patriot Party, by whatever means necessary, including robbery and murder, in order to maintain, train and equip a paramilitary armed force and otherwise to further the goals of the Supermacist Movement.
 
 
 20
 Only the defendant Miller was named in Counts Two and Three, which alleged the unlawful possession of a .22 caliber machine gun, and the making of a firearm silencer.
 
 
 21
 Unindicted co-conspirators named in the indictment are Glenn Miller, Douglas Sheets, Robert Jones, and John Vick. The indictment alleged overt acts beginning the spring or summer of 1984. These early overt acts involved the appellants Miller and Jackson, who together with Wydra, Sheets and Jones were engaged in activities attempting to obtain and obtaining weapons, explosives and other military equipment. In the latter stages of the conspiracy appellant Jackson was not involved, but appellant Miller, together with defendants Lane and Davis and other unindicted co-conspirators, acted together and "discussed illegal methods for acquiring money to satisfy the need of the White Supermacist Movement for purposes which included the acquisition of weapons, explosives and equipment for the White Supermacist Movement." Various overt acts were alleged in furtherance of a plan to acquire money to be used to acquire weapons, explosives and equipment. The government's proof tracks the allegations of the indictment, and although different individuals entered and exited the conspiracy, the purpose of the conspiracy remained the same and that was to acquire military weapons, explosives and equipment in order to maintain, train and equip a paramilitary armed force and otherwise to further the goals of the White Supermacist Movement.
 
 
 22
 An essential ingredient of a conspiracy is that the accused persons have a common aim. United States v. Goss, 329 F.2d 180 (4th Cir.1964). The common aim and purpose in the present case remained throughout the term of the conspiracy to further the goals of the White Supermacist Movement.
 
 
 23
 The government bears the burden of proving the single conspiracy that it charges in an indictment, and on appeal, this court must determine whether the evidence, when viewed in the light most favorable to the government, supports the jury's finding of a single conspiracy. Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 24
 [T]he question whether the evidence shows a single or multiple conspiracies is for the jury. If the jury is properly instructed, the finding of a single conspiracy must stand unless the evidence, taken in the light most favorable to the government, would not allow a reasonable jury so to find.
 
 
 25
 United States v. Urbanik, 801 F.2d 692, 695 (4th Cir.1986).
 
 
 26
 The evidence reflects that there was an interim or hiatus from the arrest of Robert Jones on July 8, 1985 until the spring of 1986, when no overt acts are alleged, and that after July 1985 appellant Jackson was no longer an active participant in the conspiracy. During this interim, Wendell Lane and Simeon Davis became conspirators. However, a single conspiracy does not become multiple conspiracies merely by lapse of time or change of membership. United States v. Valencia 609 F.2d 603, 625 (2d Cir.1979), cert. denied, 446 U.S. 940 (1980). In the present case the record discloses that the purpose of the conspiracy remained the same throughout its two-year existence and this purpose was to further the goals of the White Supremacist Movement by obtaining weapons, explosives and other military equipment needed to equip a paramilitary force. Stephen Miller, Robert Jackson, Douglas Sheets and Robert Jones were conspirators during the first year of the conspiracy and Stephen Miller, Wendell Lane, Simeon Davis and John Vick were among the conspirators during the last few months of the conspiracy. However, the underlying purpose of the conspiracy was the same during the summer of 1986 as it had been from its beginning.
 
 
 27
 Viewing the evidence in the light most favorable to the prosecution, we do not see that there was proof of multiple conspiracies. Even if more than one conspiracy was proved, reversal is required only where the proof of multiple conspiracies prejudiced the defendants' substantial rights. United States v. Hines, 717 F.2d 1481, 1489 (4th Cir.1983). The appellants argue that the jury was confused by the testimony concerning the overt acts of various co-conspirators over a two year span of time, and that appellant Jackson, who left the conspiracy in July of 1985, would be prejudiced by actions taken after that time by other defendants.
 
 
 28
 The jury proved that it could sort through the evidence and follow the courts instructions to consider each defendant individually and to evaluate the evidence as it applied to each defendant. The jury acquitted Anthony Wydra and found Robert Jackson guilty of Count One and Stephen Miller guilty of Counts One, Two and Three. We find no error in the trial judge's instructions to the jury.
 
 III
 
 29
 The evidence was sufficient to support the convictions of conspiracy and Miller's conviction of possessing an unregistered machine gun and of making a silencer. The evidence shows that Miller, Jackson and other co-conspirators agreed to obtain stolen and illegal weapons, explosives and military equipment from Robert Jones in order to further the goals of the White Supermacist Movement.
 
 
 30
 The evidence was also sufficient to show that Miller violated 26 U.S.C. Sec. 5861(d). Davis testified that Miller advised him that the .22 caliber rifle Miller gave him to use had been modified to fire automatically, and that he observed Miller test fire the weapon in bursts of three shots. Under 26 U.S.C. Sec. 5845 a machine gun is defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." The .22 caliber rifle in question was a machine gun under this definition and was required to be registered with the Secretary of the Treasury. A certificate from the Secretary was introduced and showed that Miller had not registered the rifle.
 
 
 31
 The evidence also supports the jury's finding that Miller made a silencer for the weapon without the approval of the Secretary of the Treasury in violation of 26 U.S.C. Sec. 5861(f). It is not a requirement of the statute that a silencer be complicated in its operation or exotic in its design. Title 26, Sec. 5861(f) of the United States Code makes it unlawful for any person to make a firearm in violation of the provisions of the National Firearms Act, codified at 26 U.S.C. Sec. 5849 et seq. (1982). The Act forbids the making, manufacturing, putting together, altering, or any combination of these to produce a firearm, unless a person has obtained the approval of the Secretary and registered the firearm with the Secretary. 26 U.S.C. Sec. 5822.
 
 
 32
 The evidence establishes that Miller attached the two-liter Pepsi bottle to the end of the rifle with the intent that it should be a silencer, and that the bottle served the purpose of a silencer because it muffled the sound and reduced the noise level. There was also proof that this alteration of the weapon had not been registered with the Secretary.
 
 
 33
 There was no error by the district court in admitting into evidence a model of the automatic rifle with the Pepsi bottle attached to the barrel. The district court has wide discretion in the admission of such illustrative or demonstrative evidence, and we do not see that the jury could have been misled into thinking that this was the actual rifle used by Miller. The record is clear that the rifle introduced was a model and not the original.
 
 IV
 
 34
 When this matter was called for trial on April 6, 1987 the defendant Robert Jackson was not present, however Jackson's attorney was present and under questioning from the court the attorney advised the court that Jackson was aware of the date of the trial and that he was to travel by car from Oklahoma to Fayetteville, North Carolina and be present when the trial began. The record reflects that when Robert Jackson was arrested in the Western District of Oklahoma and appeared before a United States Magistrate pursuant to Rule 40 of the Federal Rules of Criminal Procedure, he was represented by counsel at this appearance and was admitted to bail. The condition for his release required that he appear for arraignment in the Eastern District of North Carolina. Jackson did not appear for arraignment prior to trial, nor did he appear at trial, however, he forwarded a lengthy, hand written letter addressed to the judge and the jury dated Sunday, April 5, 1987, explaining why "I choose not to appear". This letter was not received until after the trial was completed.
 
 
 35
 The district judge arraigned Jackson in his absence, entered a plea of not guilty on his behalf, and proceeded with the trial of the charge against him. Appellant Jackson now contends that this is a clear violation of Rule 43, Federal Rules of Criminal Procedure, which provides
 
 
 36
 (a) Presence Required. The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, accept as otherwise provided by this rule.
 
 
 37
 Subsection (b) of Rule 43 provides that the progress of the trial shall not be prevented when the defendant is "voluntarily absent after the trial has commenced." Appellant argues that under the clear language of the Rule he must be present at the commencement of the trial in order for his later absence to be considered as a waiver of his right to be present. Our court has answered this argument in United States v. Peterson, 524 F.2d 167 (4th Cir.1975), cert. denied, 423 U.S. 1088 (1976) and United States v. Muzevsky, 760 F.2d 83 (4th Cir.1985). In Peterson we found that Rule 43 was intended to restate the existing law and it had to be construed in the light of the prior law. We found that it was not necessary for the defendant to be present at the commencement of the trial:
 
 
 38
 So long as the defendant has been provided with the opportunity to be present, neither purpose is thwarted by the defendant's voluntary exercise of his option not to attend. (footnote omitted). The very purpose of the exception embodied in Diaz and later adopted by the drafters of the Federal Rules, is to prevent an accused from defying with impunity 'the processes of that law, * * * [paralyzing] the proceedings of the courts and juries and * * * [turning] them into a solemn farce * * *.' (footnote omitted). To permit a defendant, free on bail, to obstruct the course of justice by absconding without a compelling reason, after having received actual notice of the time and place of trial, is as inconsistent with the purposes of the rule as to permit a defendant to abscond after the trial has commenced. (footnote omitted). We therefore hold that a defendant may waive his right to be present at the commencement of his trial just as effectively as he can waive his right to be present at later stages of the proceedings. (footnote omitted).
 
 
 39
 Peterson, 524 F.2d at 184 (emphasis in original).
 
 
 40
 Ordinarily the actions of Jackson would be sufficient for us to find that he knowingly and voluntarily waived his right to be present at arraignment and trial. The record clearly establishes that he appeared before a United States Magistrate in the Western District of Oklahoma and was advised of the charges against him, received a court appointed attorney, was released on bail, and it was a condition of his release that he appear for arraignment in the Eastern District of North Carolina. It is also clear that Jackson received a court-appointed attorney in the Eastern District of North Carolina, that he consulted with the attorney up until three days before the trial and that he was aware of the date of the trial. Jackson's intention not to attend his trial may not have been as obvious on April 6, 1987, the date the trial began, as it became a week later when the district judge received Jackson's letter dated April 5, 1987. In this letter Jackson stated that he did not believe he could receive a fair trial, that he understood the charges against him, that he understood he could be tried in his absence, and he asked that his letter be read to the jury as his closing argument. However, Jackson was later arrested and tried and convicted of failing to appear at his trial of April 6, 1987. In this later trial Jackson testified that Glenn Miller had coerced him into writing the letter and into failing to appear at the trial.
 
 
 41
 It seems obvious from the record that the district court was of the opinion that Jackson had made a knowing and voluntary waiver of his right to be present, but the court did not make this finding on the record. In Peterson, we did not address the question of when the district court must make the findings justifying an immediate trial. We stated:
 
 
 42
 each case turns upon 'a complex of issues,' including 'the likelihood that the trial could soon take place with the defendant present; the difficulty of rescheduling, particularly in multiple-defendant trials; the burden on the Government in having to undertake two trials, again particularly in multiple-defendant trials where the evidence against the defendants is often overlapping and more than one trial might keep the Government's witnesses in substantial jeopardy.' (footnote omitted). Thus the decision whether to proceed to trial is vested in the sound discretion of the trial judge.
 
 
 43
 Peterson, 524 F.2d at 185.
 
 
 44
 In Muzevsky we found that a trial judge could make findings at a post-trial hearing and satisfy the requirements set forth in Peterson and we concluded:
 
 
 45
 If the court knows the reasons for the defendant's absence, the entire Peterson analysis should be undertaken at the time the defendant fails to appear. In the proper circumstances, a short postponement of the trial might prevent the need to try an absent defendant. However, when the court does not know the reasons for the defendant's absence and has no basis to believe that the trial can be rescheduled within a reasonable time, consideration of the government's difficulty in reassembling its proof may dictate an immediate trial. This determination should be undertaken in accord with Peterson, and the court should state its reasons for proceeding. When a continuance is not granted, a court should follow the procedure that the district judge adopted in Muzvesky's and withhold decision on the motion for a new trial and sentencing until it can learn whether the defendant voluntarily waived his right to be present.
 
 
 46
 Muzevsky, 760 F.2d at page 85.
 
 
 47
 At the time the district judge made his decision to proceed to trial in the absence of the appellant Jackson, he did not have notice of the letter written by Jackson, and other evidence that might bear upon the question of Jackson's knowing and voluntary waiver of his right to be present. We conclude that this issue should be remanded to the district court in order that it may make findings under Peterson on the issue of waiver. If the district court finds that Jackson knowingly and voluntarily waived his right to be present at his arraignment and at his trial, then upon such finding Jackson's conviction is affirmed. If the district court finds that Jackson did not knowingly and voluntarily waive these rights, a new trial should be granted to him.
 
 
 48
 AFFIRMED AND REMANDED WITH INSTRUCTIONS.