998 F.2d 1011
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Marvin Anthony POINTER, a/k/a Ant, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tyrone Lovell STATON, a/k/a T Bone, a/k/a Bone, Defendant-Appellant.
 Nos. 91-5160, 91-5164.
 United States Court of Appeals,
Fourth Circuit.
 Argued: April 1, 1993.
Decided: July 16, 1993.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. J. Calvitt Clarke, Jr., Senior District Judge. (CR-90-108-N)
 James O. Broccoletti, Zoby & Broccoletti, Norfolk, Virginia, for Appellant Pointer; Joseph Barry McCracken, Cook & McCracken, Norfolk, Virginia, for Appellant Staton.
 Leslie Bonner McClendon, Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 William M. McKee, Zoby & Broccoletti, Norfolk, Virginia, for Appellant Pointer.
 Richard Cullen, United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and HALL and NIEMEYER, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Marvin Pointer and Tyrone Staton appeal their convictions and sentences for heroin possession and conspiracy to distribute cocaine and heroin. We affirm.
 
 I.
 
 2
 On September 27, 1990, appellants Marvin Pointer and Tyrone Staton were charged, along with twelve others, with conspiracy to distribute heroin and cocaine from January 1, 1984, to the date of the indictment. The 38-count indictment also charged various substantive offenses, of which two accused Pointer and one involved Staton.
 
 
 3
 Six of the fourteen defendants pled guilty. Five others were convicted following a jury trial in December, 1990. At the time of this trial, Staton, Pointer, and another defendant, Robert Watson, were fugitives. They were later apprehended and were tried together before a jury in May, 1991.
 
 
 4
 The government's key witness was Gary Weathers, the leading figure in the conspiracy. Weathers recounted that he began dealing cocaine in 1984 and expanded his business into heroin in 1985. He identified Staton as one of his original sources of drugs. Between Staton and two other sources, Weathers received 200-300 capsules of heroin twice a week for approximately one year. Over his entire drug dealing career (1984-1989), Weathers estimated that he received either cocaine or heroin two times per week.
 
 
 5
 Weathers also testified generally about drug dealing: how the drugs were packaged, what cocaine and heroin cost, how the drugs were diluted with cutting agents, and how the quality of the drugs was tested. He explained that he and his confederates used beepers and cellular telephones to keep in contact. He identified photographs of himself with various conspirators, including Pointer and Staton, and of automobiles owned by himself and Staton. He reported one instance of giving Pointer drugs to test.
 
 
 6
 The government had tapped Weathers' cellular telephone lines from May to July, 1989, and tapes of the conversations were played for the jury. Though the district court did not permit Weathers to "interpret" any particular discussion, Weathers did define the code words commonly used. "Unc" or "uncle" was a supplier in New York. Quantities of drugs were referred to as "shoe sizes." A "barrel" was a compressed form of heroin, and cocaine was "lady," "girl," or "the other side." "Bomb" described a high-quality drug. According to Weathers, all of the taped conversations revolved around drugs.
 
 
 7
 Weathers testified that Staton went to New York to purchase heroin for him two or three times during 1988; Weathers gave Staton $15,000 on each of the occasions. Weathers stated that he discussed drugs on the phone with Pointer during 1989, and he provided Pointer with heroin on several occasions during 1988 and 1989.
 
 
 8
 Finally, Weathers testified about helping to set up Staton in a "reverse sting." On March 13, 1990, while in custody, Weathers called Staton and asked him to help sell a package of heroin. Staton agreed. Weathers instructed Staton to meet Darren Brown (a conspirator who had by then pled guilty) at Morrison's Cafeteria in Norfolk, Virginia.
 
 
 9
 Weathers packaged some flour in a manner that Staton would believe was heroin. A host of law enforcement personnel took up surveillance positions at the cafeteria. Staton entered the parking lot of the cafeteria at 2 p.m. Brown entered soon thereafter. Brown walked up to Staton's car and spoke to Staton for about a minute. Staton drove off on Interstate 264 toward downtown Norfolk. Some of the officers conducting the surveillance tried to follow, but Staton managed to elude them after a high-speed chase. Portsmouth city officers later apprehended Staton, though the flour packaged as heroin was never found, and no one witnessed it actually changing hands at the cafeteria.
 
 
 10
 A Virginia state inmate, Wendell Jones, testified that he received heroin from Weathers over a nine-month period in 1986. On three or four of those occasions, Pointer was with Weathers, and sometimes Pointer would hand the drug to Weathers before the sale.
 
 
 11
 Tyrone Wallace, also a convicted conspirator, testified that he dealt heroin that he received from Weathers between 1987 and 1989. Wallace stated that he saw Pointer receive packages just like the ones he obtained from Weathers on at least two occasions.
 
 
 12
 At the close of the government's case, the district court granted a judgment of acquittal on one substantive count against Pointer and on all charges against Watson. The court denied judgment of acquittal on the conspiracy count and remaining substantive counts (one each) against Staton and Pointer. The defendants presented no evidence, and the case was submitted to the jury.
 
 
 13
 The jury convicted both Pointer and Staton of conspiracy. Pointer was convicted of possession of heroin with intent to deliver on or about July 19, 1989, and Staton was convicted of attempted possession of heroin with intent to distribute on the date of the "reverse sting" at the cafeteria.
 
 
 14
 Pointer was sentenced to life in prison for the conspiracy count and a concurrent 480 months for the substantive count. Staton received concurrent sentences of 360 months for each conviction.
 
 
 15
 Pointer and Staton appeal.
 
 II.
 
 16
 Both defendants challenge the sufficiency of the evidence to support their convictions. The evidence is sufficient if any reasonable trier of fact could have found that the elements of the crime had been established beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979).
 
 A.
 
 17
 The evidence was sufficient to support Staton's attempted possession of heroin conviction. A culpable "attempt" is the intent to commit a crime and a "substantial step" toward its commission strongly corroborative of that intent, although "mere preparation" is not a "substantial step." United States v. McLamb, 985 F.2d 1284, 1292 (4th Cir. 1993); United States v. Sutton, 961 F.2d 476, 478 (4th Cir.), cert. denied, 113 S.Ct. 171 (1992). Here, the government proved Staton's intent through Weathers' testimony about setting up the delivery of the flour disguised as heroin and more generally through the considerable evidence of Staton's involvement in heroin trafficking. Staton's arrival at the appointed hour, conversation with the appointed person, and high-speed getaway combine to constitute a "substantial step" strongly corroborative of his intent to possess heroin.
 
 B.
 
 18
 Pointer's substantive conviction-possession of heroin with intent to distribute on or about July 19, 1989, is supported by Weathers' testimony that he supplied heroin to Pointer during 1988 and 1989 and taped phone calls between Weathers and Pointer. Weathers stated that these phone calls involved drugs, and a reasonable trier of fact could have so interpreted them. On July 19, 1989, Pointer told Weathers, "I got the, uhm, I supposed to see you. I might have somethin, some, tonight." After he told Weathers that the customer wanted "$500 worth," Weathers responded, "Of what you had? Of what you got yesterday?"
 
 
 19
 On July 25, Pointer asked Weathers if he had "one them things." Weathers said, "I ain't, ain't no more." After discussing the "damn police" and how the "shit" was "moving too slow," Pointer counted his blessings: "A pound a day ain't bad."
 
 
 20
 A reasonable jury could have found beyond a reasonable doubt that Pointer possessed heroin with intent to distribute on or about July 19, 1989.
 
 C.
 
 21
 Both defendants claim that the evidence showed the existence of many small conspiracies, but not the single large conspiracy charged. They do not question the propriety of the jury instructions; indeed, the court gave instructions proposed by the defendants. In this circuit, "[i]f the jury is properly instructed, the finding of a single conspiracy must stand unless the evidence, taken in a light most favorable to the government, would not allow the jury to so find." United States v. Urbanik, 801 F.2d 692, 695 (4th Cir. 1986).
 
 
 22
 The evidence was sufficient here. The entire conspiracy may not have been the most tightly organized in the annals of crime, but, then again, drug rings rarely adopt bylaws or blood oaths. In any event, Weathers did orchestrate heroin and cocaine distribution for over five years, and both defendants played their roles on cue. The phone logs, taken as a whole, show an intimate familiarity between Weathers and each of the defendants and a preoccupation with discussion of drug dealings. However weak the gravity may have been on the outer fringes of the organization, Staton and Pointer were near or at its nucleus.
 
 
 23
 We affirm the convictions.
 
 III.
 
 24
 At sentencing, both defendants' "relevant conduct" was found to include 35.5 kilograms of heroin and 39 kilograms of cocaine, resulting in a base offense level of 38. These drug quantities were an estimate of the total amount of drugs distributed by this long-term conspiracy. On the conspiracy charge, each was given a three-level enhancement for "manager/supervisor" role. Finally, Pointer was assessed two more levels for possession of a gun in relation to the conspiracy. Pointer's final offense level 43 led to a life sentence, while Staton's level 41 earned him thirty years. District courts use a preponderance of the evidence standard in making factual findings at sentencing, United States v. Urrego-Linares, 879 F.2d 1234, 1238 (4th Cir.), cert. denied, 493 U.S. 943 (1989), and we review those findings for clear error. United States v. Daughtrey, 874 F.2d 213 (4th Cir. 1989).
 
 
 25
 At the sentencings, the government's witness was DEA agent Watters. Watters summarized two types of information: (i) testimony at the prior trial of five of the conspirators, and (ii) statements made by conspirators in debriefings. Watters' testimony was thus all hearsay. Neither Staton nor Pointer offered any evidence in rebuttal.
 
 
 26
 Though evidence received at sentencing need not be strictly admissible under the rules of evidence, it must have at least "sufficient indicia of reliability to ensure its probable accuracy." Urrego-Linares, 879 F.2d at 1237 (quoting U.S.S.G. § 6A1.3). As for the prior trial testimony, we see no reliability problem, inasmuch as the testimony was made under oath subject to cross-examination by persons with the same motive to discredit the witness as had Pointer and Staton. The debriefing statements are arguably less reliable, because of the potentially coercive atmosphere, motive to fabricate, and absence of cross-examination. On the other hand, the district court is in a better position than we to decide how much weight to assign various pieces of evidence. Here, where the debriefing statements were just a part of the government's evidence rather than its most vital underpinning, we cannot say that the district court committed clear error by considering them to complete the full picture of the conspiracy.
 
 
 27
 Finally, we must note that the defendants countered no item of proof with competing evidence. Instead, they rely solely on their argument that the government's evidence was too weak to stand on its own. Though this strategy is sometimes a good one at trial, where the government's burden of proof is rigorous, it is a risky strategy at sentencing. Left unrebutted, "reliable" hearsay, corroborated and fleshed out by less-reliable hearsay, is a preponderance of the evidence.
 
 
 28
 The evidence presented through Watters showed that Staton was involved in the conspiracy for five years, that the conspiracy consisted of over a dozen persons, that he acted as a liaison/courier who obtained large quantities of heroin for the conspiracy in New York, which he brought back to the Portsmouth area for subdivision, and that he distributed drugs to street dealers. From this information, the district court's findings that the entire amount of drugs distributed by the conspiracy was "reasonably foreseeable" from the standpoint of Staton's criminal undertaking and that he had a"manager/supervisor" role in the offense were not clearly erroneous.
 
 
 29
 Pointer was likewise involved in the conspiracy for its entire duration. Four conspirators described him as Weathers' top lieutenant. At Weathers' direction, he received and distributed drugs, tested their quality, and collected debts. The role in the offense and relevant conduct (drug weight) findings for Pointer are not clearly erroneous.
 
 
 30
 Pointer's firearm enhancement resulted from his having shot and injured Marvin Wright over a drug debt. Wright brought charges against Pointer, but then refused to testify after he received a threatening phone call. Weathers and another conspirator, Tyrone Wallace, witnessed the shooting and corroborated Wright's original charge.
 
 
 31
 The district court's findings at sentencing are not clearly erroneous.
 
 
 32
 We affirm the convictions and sentences.
 
 AFFIRMED