**UNITED STATES of America, Appellee,**

v.

**Harald Olav NYMAN, Appellant.**

**No. 79–5340.**

United States Court of Appeals,
Fourth Circuit.

Argued Aug. 21, 1980.

Decided Oct. 17, 1980.

W. Zane Daniel, Knoxville, Tenn., for appellant.

Justin W. Williams, U. S. Atty., Alexandria, Va. (Raymond A. Jackson, Asst. U. S. Atty., Norfolk, Va., on brief), for appellee.

Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Harald Olav Nyman appeals his conviction under 18 U.S.C. § 2312 for willfully transporting a stolen aircraft in interstate commerce. He assigns as error the trial court's refusal to allow his attorney to introduce into evidence the testimony of a law clerk/investigator for the purpose of impeaching two government witnesses. Finding the trial court's refusal to constitute prejudicial error, we vacate the judgment of the district court and remand for a new trial.

I

The evidence at Nyman's trial revealed that Hopson P. Wood, a real estate broker, discovered on June 12, 1979 that his Beechcraft KingAir airplane was missing from a Knoxville, Tennessee airport. That same day, a plane, later identified as Wood's, was observed to land at the South Norfolk Airport in Chesapeake, Virginia. Tom Stevens, a lineman at the airport, saw the plane land and helped the pilot out. He testified that the pilot wore a white Puka shell necklace, sported what appeared to be a 4–5 day old, inch–long beard, and carried a dark brown gym–type bag and a carton of Pall Mall cigarettes. Having earlier picked Nyman's picture out of an F.B.I. photo spread, Stevens repeated his identification of Nyman as the pilot in court.

James Tarkington, a flight instructor at the South Norfolk Airport, also saw the pilot of the stolen plane disembark. Tarkington testified that, while he had "no dealings" with the pilot, he could recall that the man had an approximately inch–long beard and that he was carrying a black briefcase. Like Stevens, he identified Nyman as the pilot, both in a photo spread and in court.

Mrs. Dana Stevens, the sister–in–law of Tom Stevens and an employee at the South Norfolk Airport, also spoke with the pilot of the stolen plane, helping him locate a motel in the telephone book. Her contact with the pilot was admittedly brief, and she could not positively identify him as one of the men pictured in the photo spread. She did, however, identify Nyman as the pilot in court.

Lane Hardison, a local pilot, testified that he gave the pilot of the stolen plane a ride from the airport to Ingram's Auto Parts in Norfolk, the destination requested by the pilot. The pilot told Hardison that he was from the Boston area and that the plane was from Tennessee. Hardison testified that the pilot had a 3–4 week old beard and carried a black attache case. Although Hardison enjoyed the greatest exposure to the pilot of the stolen plane of any of the government's identifying witnesses–approximately fifteen to thirty minutes–he was unable positively to identify Nyman as that pilot in a photo spread that was subsequently shown to him by the F.B.I. In response to a question on cross–examination, however, Hardison did make an in-court identification of Nyman as the pilot.

James Clark testified that he serviced an airplane matching the description of the stolen Beechcraft KingAir at Homestead General Aviation Airport in Homestead, Florida on the same day that it later landed in Norfolk. Like Hardison and Dana Stevens, Clark did not pick Nyman from the F.B.I. photo spread but was able to make an in–court identification of him as the pilot of the stolen plane.

Nyman's former girlfriend, Elizabeth Polyefko, testified that Nyman did own a white Puka shell necklace and always smoked unfiltered Pall Mall cigarettes.

Nyman's defense, based almost entirely on his own testimony, was essentially one of alibi and mistaken identity. He testified that he had been in Kansas City, inquiring about a plane that was being repaired there for his employer, at the time the Beechcraft KingAir was stolen from the Knoxville Airport. In addition, he testified that he had often been mistaken for the son of the owner of a prominent flight school in Massachusetts, a photo of whom was introduced into evidence.

The only other witness proferred by the defense was Steve Oberman, a third–year law student who worked part–time as a law clerk/investigator for Nyman's attorney and for other attorneys in the Knoxville area. The trial court refused to allow him to testify, reasoning that, because Nyman's attorney could not testify, Oberman, as a regular employee and, therefore, a representative of the attorney, should also be prohibited from testifying. Oberman was allowed to testify, however, for the record and out of the presence of the jury. He stated that shortly before the commencement of Nyman's trial on the morning of October 30, 1979, he was talking with two of the government's witnesses, Tarkington and Hardison, in the hall outside the courtroom when Nyman approached them and spoke briefly with Oberman. Approximately thirty seconds later, Oberman asked the two witnesses whether they had seen the pilot of the stolen Beechcraft at any time since June 12. Oberman said they both responded that they had not.

The interlocking issues raised by this appeal, therefore, are whether the trial court erred in excluding Oberman's testimony and, if so, whether that error was harmless.

## II

The trial court held that it was impermissible for the regularly employed representative of an attorney to testify at a trial in which the attorney was engaged inasmuch as the attorney himself might not testify. We note at the outset that there is

no rule of evidence absolutely excluding the testimony of a lawyer on behalf of his client. Although the courts have usually frowned on such testimony as a violation of Disciplinary Rule 5–102(A) of the American Bar Association's *Code of Professional Responsibility*, the general rule is that an attorney is competent to testify when the testimony is important and no other witness would be able to supply it. *See Universal Athletic Sales Co. v. American Gym Corp.*, 546 F.2d 530, 539 (3d Cir. 1976); *United States v. Fiorillo*, 376 F.2d 180, 185 (2d Cir. 1967). The question whether an attorney is competent to testify, however, is committed to the discretion of the trial court, subject to the normal review for abuse. *See, e. g., Bickford v. John E. Mitchell Co.*, 595 F.2d 540, 544 (10th Cir. 1979) (no abuse of discretion in permitting); *United States v. Vereen*, 429 F.2d 713, 751 (D.C.Cir.1970) (abuse in refusing); *Travelers' Insurance Co. v. Dykes*, 395 F.2d 747, 748–49 (5th Cir. 1967) (no abuse in refusing).

█ The trial court in the instant case, however, extended this discretionary authority to exclude the testimony of the law clerk/investigator of Nyman's attorney. We therefore examine the reasons given for excluding the testimony of an attorney on behalf of his client to determine whether those reasons apply with similar force to the testimony of an attorney's nonprofessional employee. The two major policy reasons for refusing to allow an attorney to testify on behalf of his client were long ago identified by Dean Wigmore. *See VI Wigmore on Evidence* § 1911 (Chadbourne rev. 1976). The first is the concern that the public's respect for and confidence in the legal profession will be diminished by the lay belief that attorneys may distort the truth for the benefit of their clients. *Id.* § 1911, at 775. The second is the somewhat contradictory fear that the members of a jury will be unduly impressed with the weight of an attorney's testimony. *Id.* at 780.

Neither of these reasons can be ascribed substantial significance with respect to the testimony of an attorney's employee in general or to the testimony excluded in the present case in particular. Although there may be some concern about the public's conception, or misconception, of the propriety of an attorney's employee testifying on behalf of a client, that concern is not of sufficient consequence to merit blanket exclusion of potentially significant testimony. Similarly, any aura of professional credibility that might be thought to surround an attorney so that his testimony might unduly influence a jury is not likely to extend to nonprofessional employees. These distinctions are particularly applicable here. Oberman had not participated in the presentation of the case to the jury and had not even been in the courtroom during the testimony of the other witnesses. Indeed, it is difficult to discern any difference between the competency of Oberman as a witness and that of any independent or governmental investigators, who are unquestionably competent to testify. The relationship of Oberman to Nyman and his attorney would no doubt have been highlighted by the government on cross–examination and in jury argument, but that relationship properly goes to the weight of Oberman's testimony and not its competency. Because we think that a trial court's discretion as to the competency of an attorney's testimony does not extend to that of nonprofessional employees such as Oberman, we conclude that it was error for the district court to exclude this testimony on that basis.

### III

█ The conclusion that the trial court erred, however, does not end our review. The question remains whether that error "affect[ed] the substantial rights" of this defendant, 28 U.S.C. § 2111, or was on the contrary harmless. Fed.R.Crim.P. 52.

In the realm of nonconstitutional error, the appropriate test of harmlessness, as expressed by Justice Rutledge in *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), is whether we can say "with fair assurance, after pondering all that happened without stripping

the erroneous action from the whole, that the judgment was not substantially swayed by the error." In applying this test it is important to keep in mind that it does not ask whether we believe that irrespective of the error there was sufficient evidence to convict, but whether, as Justice Traynor expressed it, we believe it "highly probable that the error did not affect the judgment." R. Traynor, *The Riddle of Harmless Error* 34–35 (1976).

In applying this test to the record of "all that happened" in the trial of this case, we draw upon the helpful refinement suggested in *Gaither v. United States*, 413 F.2d 1061 (D.C.Cir.1969): "[t]he decisive factors [in applying the *Kotteakos* standard] are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Id.* at 1079. Here, of course, no steps were taken to mitigate an error whose existence was not recognized. Next, the issue affected by the exclusion of Oberman's testimony, which was offered to impeach two identifying witnesses, was not only central, but was essentially the only controverted issue in the case–the identification of Nyman as the pilot of the stolen plane.

There remains only the closeness of the case as a factor about which there could be serious dispute. On this, despite the government's characterization of the evidence against Nyman as "overwhelming," we consider that the case below must be assessed as a close one in which the judgment of the jury might well have been swayed by the excluded testimony. First off, it was an alibi–eyewitness identification case whose resolution depended utterly upon the acceptance of one of two directly contradictory versions of the critical fact in issue. The alibi testimony, though unsupported, was nevertheless only directly contradicted by the identification witnesses. The probative force of the latter testimony was thus critical. It was given by five persons. Though there was little discrepancy in their descriptions of the pilot of the plane, and all made in–court identifications of the defendant as that pilot, only two of the identifying witnesses had been able or willing to identify the defendant from a photo spread before trial, and Hardison, the one with the greatest opportunity to observe the defendant, was not one of these. The resulting concern of the jury about the defendant's identification is demonstrated by their request at one point in their deliberations to examine the pre–trial, apparently contradictory, written statements of three of the witnesses. Finally, there is the fact that in this narrow, single issue case, the jury required approximately five hours to reach a decision, prompting the trial court at one point to consider giving a modified *Allen* charge. *See United States v. Robinson*, 544 F.2d 611, 619–20 (2d Cir. 1976).

Under these circumstances, without regard to whether we–reading a cold appellate record–would consider the question of guilt a close one, it is obvious that for this jury it was. It is equally obvious that under these circumstances any evidence tending–if believed–to shake the credibility of any of the critical identification testimony could have been of decisive importance in tipping the balance. Whether we would consider such a decisive tipping by the proffered testimony rationally justifiable on the whole record is again not the question. Our assessment goes only to the probability that its exclusion could have affected the verdict reached by this particular jury in the particular circumstances of this trial. Because on that assessment we cannot say "with fair assurance . . . that the judgment was not substantially swayed by the error," we must find that error prejudicial, not harmless. On that basis we vacate the judgment and remand for new trial.

VACATED AND REMANDED.

DONALD RUSSELL, Circuit Judge, dissenting:

I would affirm on the ground that if there was error, it was harmless.