UNITED STATES of America, Appellee,

v.

Neville Bruce THOMPSON, Appellant.

No. 82–5201.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 8, 1983.

Decided Aug. 31, 1983.

Jack B. Crawley, Jr., Rocky Mount, N.C. (Spruill, Lane, McCotter & Jolly, Rocky Mount, N.C., on brief), for appellant.

Margaret I. Miller, Dept. of Justice, Washington, D.C., (Samuel T. Currin, U.S. Atty., Raleigh, N.C., on brief), for appellee.

Before WINTER, Chief Judge, WIDEN-ER, Circuit Judge, and BRYAN, Senior Circuit Judge.

ALBERT V. BRYAN, Senior Circuit Judge:

Indicted for bank robbery,[1] appellant Neville Bruce Thompson was found guilty by a jury in the Federal Court for the Eastern District of North Carolina and sentenced to imprisonment for sixteen years. He now appeals, primarily asserting that certain testimony allowed at trial violated his privilege against disclosure of marital communications. Although we conclude that the trial court erred in permitting the Government to introduce this evidence, we see the error as harmless and so affirm.

I

On November 4, 1981, at about 11:30 a.m., a man driving a silver-colored Capri automobile stopped at the drive-in window of the Planters National Bank in Rocky Mount, North Carolina. The driver, a black male, placed a note in the teller's drawer reading, "Don't do anything stupid. I know where you live. Anything go wrong, my friend will get you. I want cash." The teller, Shirlee Evans, put $1,230 in the drawer and asked a colleague to activate a silent alarm. The driver then grabbed the money and sped out of the parking lot while Evans recorded his license plate number.

Within the hour, local police identified the license as that of a silver Ford Capri belonging to Thompson. At approximately 2 p.m. the same day, F.B.I. agents visited Thompson's home in Rocky Mount. Thompson's wife told the agents that her husband had left home that morning but had neither returned nor since been in touch with her.

Despite the initial failure of the F.B.I. to locate Thompson, a complaint accusing him of the robbery was filed in January of 1982. Subsequent conversations with his wife convinced the F.B.I. that Thompson was living in New York City and using the name "Bruce Mugabe." Further investigation traced him to the Bronx, New York, where he was arrested on March 23, 1982.

Prior to trial, the F.B.I. displayed an array of photographs of seven black males to the teller, Evans, and asked her to identify the robber. On the first occasion she failed to identify Thompson's picture, but positively identified him in her second attempt, thirteen days before trial. On the date of trial, June 25, 1982, the Court denied the defendant's request for a lineup.

Thompson testified that on the morning of the robbery he had driven to a local shopping mall. After shopping and eating lunch, he discovered that his car had been taken from the parking lot. He maintained that at approximately 11:15 a.m. he telephoned his wife who told him the police wanted to question him in connection with a bank robbery. Thompson said that because he believed he could not receive a fair trial in North Carolina, he fled to New York. He used the alias "Mugabe" for "tax reasons."

Among the prosecution's witnesses was the bank teller, Evans, who was asked if the robber was in the courtroom. She pointed to Thompson and said "I believe it's [the defendant] but I'm not positive." She explained that while the defendant had a

---

1. 18 U.S.C. § 2113(a). The section reads:
   Bank Robbery and incidental crimes
   (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
   Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—
   Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.
   \*   \*   \*   \*   \*   \*

beard and wore glasses the robber had been clean shaven and was without glasses.

His wife, however, exercised her spousal privilege and declined to testify on behalf of the Government. This refusal prompted the Court to rule that the wife was unavailable as a witness. It then allowed an F.B.I. agent, Thomas, to testify about his conversations with her.[2] In particular, the agent said that when he asked her about her husband's whereabouts in January 1982,[3] she described a conversation in which the defendant had become irritated and blamed his dilemma on her "because she kept pressuring him to get a job."[4]

## II

In adopting the Federal Rules of Evidence, Congress eliminated all proposed rules governing the nonconstitutional privileges of witnesses. S.Rep. No. 1277, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 7051, 7058. Rather, it chose to leave to the Federal courts the task of interpreting the standards for privileges from the principles of the common law "in the light of reason and experience." Fed.R. Evid. 501.

At common law, the Federal courts extended immunity to confidential communications between husband and wife. *Stein v. Bowman,* 38 U.S. (13 Pet.) 207, 222, 10 L.Ed. 129 (1839). They deemed this privilege to be so indispensable to the preservation of the marriage relationship that it outweighed any consequent disadvantages to the administration of justice. *Wolfle v. United States,* 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934). The doctrine remained distinct from the rule that enabled

one spouse to prevent the other from testifying. *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980); *United States v. Lefkowitz,* 618 F.2d 1313, 1317 (9th Cir.1980); 8 J. Wigmore, Evidence in Trials at Common Law, § 2333 (McNaughton rev. ed. 1961).

▮ In its present form, the privilege dictates that "marital communications are presumptively confidential." *Blau v. United States,* 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951). The party seeking to avoid the privilege bears the burden of overriding this presumption. *Id.; Hipes v. United States,* 603 F.2d 786, 788 (9th Cir. 1979). Proof of either the presence of a third party at the time of the communication, or of the intention that the information conveyed be transmitted to a third person, will negate the presumption of privacy. *Pereira v. United States,* 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954).

▮ Although the Government in the instant case adduced no evidence that dispelled the assumption of confidentiality, the Court permitted Agent Thomas to testify about statements the defendant made in confidence to his wife. The Court consequently committed error in allowing Thomas to testify about the defendant's comment that his wife was to blame for his predicament.

▮ Nevertheless, this Court must ascertain whether the error affected the substantial rights of the defendant. 28 U.S.C. § 2111; Fed.R.Crim.P. 52(a). The appropriate test for determining the harmlessness of nonconstitutional error is whether it can be said "with fair assurance, after pon-

---

2. Agent Thomas spoke with Mrs. Thompson on three occasions: November 4, 1981, January 27, 1982 and June 11, 1982. The Agent testified that, during the November 1981 conversation, Mrs. Thompson told him that she did not know where her husband was. He also declared that on that day the supply of food in the Thompson household was low, and that Mrs. Thompson said that many of the family's bills were unpaid.

3. Thomas testified that Mrs. Thompson said she repeatedly had told her husband that the

F.B.I. was searching for him and "asked him to turn himself in . . . ." She also said, according to Thomas, that she learned of her husband's use of the alias "Mugabe" from the return address on the defendant's letters to her.

4. Thomas testified: "He [Thompson] stated to her that it was her fault that he was in the situation that this happened. The reason it was her fault was because she kept pressuring him to get a job."

dering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *United States v. Nyman,* 649 F.2d 208, 211–12 (4th Cir.1980). This exaction necessitates an examination of the probability that the error "could have affected the verdict reached by the particular jury in the particular circumstances of the trial." *United States v. Davis,* 657 F.2d 637, 640 (4th Cir.1981). During the course of this inquiry, the court may consider other evidence of the defendant's guilt, *id.,* the steps taken to mitigate the error, *Nyman,* 649 F.2d at 212, and the centrality of the issue affected by the error. *Id.*

■ Presently, the evidence upholding Thompson's conviction was so conclusive "that it is altogether unlikely that the error affected the verdict." *Davis,* 657 F.2d at 640. The evidence adduced at trial identified Thompson's car as the one used in the robbery and proved that upon *learning* of the crime he fled to New York where he employed an alias for several months. Although the error here involved an issue of importance, the prosecutor did not highlight the flawed testimony by repeated questioning nor did he refer to it in closing argument. See *United States v. Espinosa—Cerpa,* 630 F.2d 328, 335 (5th Cir.1980). Thus, we conclude that the error did not affect the judgment of the jury.[5]

### III

■ Thompson also maintains that the Court erroneously denied his motion for a lineup. Nonetheless, the defendant made this request on the morning of trial and the Court noted that the defendant had altered his appearance since the crime. In denying

the motion, the Court did not abuse its discretion. See *United States v. Bennett,* 675 F.2d 596, 598 (4th Cir.), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2306, 73 L.Ed.2d 1307 (1982); *United States v. Ravich,* 421 F.2d 1196, 1203 (2d Cir.1970).

■ Finally, the defendant questions the sufficiency of the evidence to convict, averring that the Government failed to prove he committed the crime and that the taking was accomplished with force or intimidation. See *United States v. Howard,* 506 F.2d 1131, 1133 (2d Cir.1974) (essential elements of bank robbery). Assessing the evidence most favorably to the prosecution, see *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), the Government established beyond a reasonable doubt that the defendant was the individual who stole the money from the Planters National Bank. The use of a note containing a threat does not defeat the conclusion that sufficient intimidation was pressed for purposes of 18 U.S.C. § 2113(a). *United States v. Epps,* 438 F.2d 1192, 1193 (4th Cir.1971).

The judgment of the District Court is AFFIRMED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I think that, when the district court admitted into evidence the privileged statements of Thompson's wife, it committed reversible error. I thus would not pass upon the other questions addressed in the opinion of the majority except that of harmless error, for I do not feel that "it can be said with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328

---

**5.** In addition to the proof just recounted, the record fully manifests that the defendant made false exculpatory statements. Among these, a neighbor declared that he saw Thompson leave his house in the car used in the robbery one hour later than the defendant fixed it. Despite Thompson's assertions, he never reported his car as stolen. Further, records of the hotel at which Thompson said he stayed on the after-

noon of the robbery did not record his visit. Finally, Thompson averred that his wife told him the police were looking for him when he called her at 11:20 a.m. on the morning of the robbery. The evidence, however, shows that the bank was not robbed until 11:30 a.m. and the police did not contact his wife until 2:00 p.m.

U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

I agree, of course, with the holding of the majority, that admitting the privileged statements into evidence was error. But in order to analyze the extent of the error, I suggest that such evidence be placed in the following setting.

The identification of the bank robber was not so certain as might be desired. It was an important, and really the only contested issue in the case, and the district court devoted two and one-half pages of its charge to that matter alone "at the outset," to quote the district court. The teller who attended the robbery failed to identify Thompson's picture when first shown to her but was able to do so in a second attempt some seven months later and thirteen days before trial, as the majority points out. The teller's identification of Thompson in the courtroom was even more uncertain: "I believe it's [the defendant] but I am not positive." The FBI agent, Thomas, interviewed the defendant's wife on at least three occasions.

In this setting, the government introduced evidence that the defendant's wife told FBI agent Thomas in his first interview with her, the day of the bank robbery, that all the family bills were behind, including the light and telephone bills, that the rent had not been paid, and that there was no money in the house.

Later, she told Thomas that she had told her husband several times that the FBI was looking for him and had asked him to turn himself in to the FBI. Of course Thompson had not turned himself in.

She told the FBI agent the whereabouts of her husband from the return address on a letter she had received from him and that he was going under the alias "Mugabe."[1] She further told the FBI agent that on at least two occasions her husband had become irritated with her when the subject of the bank robbery came up and told her that it was her fault that "this [which obviously could have meant the bank robbery] happened," the reason it was her fault being that she kept pressuring him to get a job.[2]

Thus, the statements of the defendant's wife to the FBI agent introduced into evidence proved the use of an alias which itself is evidence relevant to show consciousness of guilt. *United States v. Boyle,* 675 F.2d 430 (1st Cir.1982); 2 *Wigmore on Evidence* § 276 (Chad.Rev.1979). It also showed the defendant's flight which also may be taken to evince his consciousness of guilt. *United States v. Paige,* 324 F.2d 31 (4th Cir.1963); 2 *Wigmore on Evidence,* § 279, supra. And, of course, the statement of the defendant to his wife that the affair would not have happened had she not been pressuring him to get a job could well have been, and probably was, taken by the jury to amount to a confession.

The statement of the defendant's wife to the FBI agent that the household bills were unpaid, including the lights and telephone, that the rent was past due, and that there was no money in the house obviously supplied a motive for the crime.[3]

The route the government took in seeking the introduction of the evidence in question is worthy of note for the findings bear

1. Declining to divulge the whereabouts of an absent wife in hiding was explicitly held to be privileged in *Blau v. United States,* 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951).

2. Although perhaps not as crucial as the wife's statements recited above, especially since identification was the issue in the case, evidence was also introduced that Thompson's wife told the FBI agent where she banked which was the same bank which was robbed, the Planters National (she showed the agent her deposit slip which was similar to the one on which the robbery note was written). In addition, she told the agent that Thompson drove a grey

Capri automobile (which was similar to the one used in the robbery).

3. If the majority opinion may suggest that *communications* between husband and wife are privileged, but other testimony on the part of the testifying spouse is not, see generally *Wigmore on Evidence,* McNaughton Rev.1961, §§ 2227–2245; 2232–2240, that theory has been rejected in terms in *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), which modified *Hawkins v. United States,* 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1980), to the extent that now only the witness may claim the privilege. "Its [the privilege's] protection is not limited to confidential commu-

persuasively on the question of harmless error. The government moved to admit the statements of the wife as hearsay, and they were admitted under FRE 804(b)(5). In the course of making that ruling, the district court specifically found:

"... that the statements sought to be offered by the government in this case contain evidence as to material facts in the case and that they are more probative on the point for which it is proposed that they be offered than any other evidence which the government has procured through reasonable efforts."

We have, then, the privileged statements of the wife tending to show motive, flight, alias, connection with the crime, and a confession of guilt. These statements have been correctly found by the district judge (although in a somewhat different context), who saw the witnesses and heard them testify, to be more probative on the points for which they were offered than any other evidence the government had procured. I am not able to see, and cannot agree, that admitting these statements into evidence was harmless error.

I would vacate the conviction and remand for a new trial.

nications; rather, it permits ... [the exclusion of] all adverse testimony." *Trammel* 445 U.S.

at p. 51, 100 S.Ct. at p. 912.