884 F.2d 1390
 28 Fed. R. Evid. Serv. 1096
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Floyd TAYLOR, Defendant-Appellant.
 No. 89-5023.
 United States Court of Appeals, Fourth Circuit.
 Argued July 13, 1989.
Aug. 24, 1989.
 
 James Clyde Clark (Richard S. Mendelson, Land, Clark, Carroll & Mendelson, P.C. on brief) for appellant.
 Andrew Stephen Bennett, Special Assistant United States Attorney (Henry E. Hudson, United States Attorney on brief) for appellee.
 Before ERVIN, Chief Judge, and PHILLIPS and WILKINSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 Floyd Taylor challenges on various grounds his conviction of (1) conspiracy to possess and distribute cocaine in violation of 21 U.S.C. Sec. 846; (2) unlawful possession with intent to distribute cocaine in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2; and (3) interstate travel in aid of racketeering in violation of 18 U.S.C. Secs. 2 & 1952. Finding no reversible error, we affirm.
 
 
 2
 * Floyd Taylor was arrested on September 9, 1988 at the Washington National Airport after a deplaning passenger, Holvin Vega, who was found to be carrying cocaine, identified Taylor as the person to whom he was delivering the drugs.
 
 
 3
 Agents of the Drug Enforcement Agency's (DEA's) Mass Transportation Task Force had stopped Vega as he was deplaning from a shuttle flight from New York because he appeared nervous and had a noticeable bulge about his stomach area. After several minutes of questioning, Vega agreed to a search if it were conducted in the men's room. During this initial stop, one of the agents noticed that Taylor was watching them and followed them to the men's room. Once there, Vega pulled more than 495 grams of cocaine from his waistband,[1] telling an agent that it was for the individual outside (Taylor), who was to pay $700 for it. The agents then arrested Taylor, finding approximately $690 on his person.
 
 
 4
 At trial, Vega testified pursuant to a plea agreement. He stated that he first met Taylor at a Mr. Dickey's house, where he agreed to transport drugs for Taylor from New York to Washington, D.C., for $1,000 each trip. He further testified that he spoke to Taylor by phone from New York on the morning of September 9, and Taylor told him that he would pay him $300 up front for a delivery that day and $700 when he arrived with the drugs in Washington, D.C., on the 1:00 p.m. shuttle flight. Vega claimed that he then went to the New York address that Taylor gave him and met an unidentified woman who gave him $300 and the cocaine. He also testified that he missed the 1:00 shuttle due to traffic but called Taylor at Mr. Dickey's house and told the woman who answered the phone--"Cynthia"--that he was running late.
 
 
 5
 Over defense objection, the district court allowed Vega to testify on direct that while he was being questioned by the DEA agents at the airport, Taylor gestured to him to remain silent, and that while he and Taylor rode in a United States Marshall's van en route to their preliminary hearing, Taylor promised to help Vega acquire bond money and told Vega that he had better "take [him] out" of the case. Finally, the court allowed Vega to testify that Taylor made a threatening gesture to him at the Alexandria jail on the morning of trial. The court disallowed other testimony, however, which concerned implied threats made by Taylor during a recess at trial.
 
 
 6
 In defense, Taylor presented a very different version of the relevant events. He averred that at the time of his arrest he was living at a friend's house rent free in exchange for performing household repairs. On the morning of September 9, he claims that he went to a McDonald's Restaurant where he (by chance) met Cynthia, whom he knew as a frequent customer at a restaurant where he had been working earlier in the year. Taylor agreed to pick up her friend "Cholo" (Holvin Vega) at Washington National Airport, and to impress Cynthia, who he thought was an attractive woman, Taylor told her that he had to pick up $700 from his housemate on the way to the airport. According to Taylor, he then drove back to his friends' house, where his friend gave him $700 to buy materials for house repairs, and then on to the airport to pick up Cholo.
 
 
 7
 Taylor further testified that when he saw Vega being questioned, he walked toward the group because Vega was pointing at him. He also claimed that he was attempting to determine what was occurring so that he could tell Cynthia what happened. Taylor denied engaging in conversation with Vega at any point following the arrest or making any threatening gestures.
 
 
 8
 After Taylor testified, the court permitted the prosecution, despite its failure to turn the admitted evidence over to the defense before trial, to introduce evidence about a stun gun[2] found in a car (presumably belonging to Taylor) abandoned at the airport on the ground that it impeached Taylor's innocent explanation of his trip to the airport.[3] On surrebuttal, Taylor denied having a gun in his car and further testified that many people had access to the car.
 
 
 9
 Following his conviction by the jury, the district court, against a probation officer's recommendation, imposed a two-level enhancement of Taylor's sentence based on the evidence that Taylor threatened Vega and thus obstructed justice within the meaning of Sec. 3C1.1 of the Federal Sentencing Guidelines.
 
 
 10
 This appeal followed.
 
 II
 
 11
 Taylor first challenges the district court's admission of Vega's testimony about the alleged threats against him.[4] Specifically, he contends that the testimonial evidence was impermissibly vague, unduly prejudicial and had little probative value.
 
 
 12
 We agree that Vega's testimony recounting the "threats" is not a model of clarity, but we think that it is not so vague as to render it incomprehensible, stripping it of any potential probative value.
 
 
 13
 Taylor also challenges admission of the threat evidence on the grounds that it was irrelevant to any issue but his character, as to which it was inadmissible, and that in any event its probative value was substantially outweighed by unfair prejudice.
 
 
 14
 As a general rule, evidence of threats to witnesses, though not admissible to prove bad character, see Fed.R.Evid. 404, can be legally relevant to show consciousness of guilt. See, e.g., United States v. Guerrero, 803 F.2d 783, 785 (3d Cir.1986). Taylor claims that the probative value of the alleged threats in this case is minimal because the pertinent conduct is fully consistent with that of an innocent person attempting to discourage a witness from testifying falsely against him. While some interference with witnesses may not be adequately probative to show consciousness of guilt because it "demonstrates only a preference to avoid legal involvement," such interference is certainly probative when its specificity, such as the pointed verbal and nonverbal admonitions in this case, "impl[y] a knowledge and fear of particular and damaging testimony intimately related to the prosecution at hand." United States v. Monahan, 633 F.2d 984, 985 (1st Cir.1980). The evidence here meets this test of relevance.
 
 
 15
 That leads to the question whether its probative value here outweighed its potential for unfair prejudice. See Fed.R.Evid. 403. Evidence of this kind of witness threatening requires careful balancing by trial courts, because relevant evidence of threats may cause a jury to base its decision on something other than proof of the elements of the offense charged. Guerrero, 803 F.2d at 785. See generally Fed.R.Evid. 403 advisory committee's note. Several factors are relevant in determining whether threat evidence should be excluded in a particular case. First, the "need" for the evidence, which in this context means "the importance and centrality to the ultimate issue in the case of the fact sought to be proved by the threat evidence, and the availability of other evidence to establish the fact sought to be proven...." Guerrero, 803 F.2d at 786. See also C. Wright & K. Graham, Federal Practice & Procedure Sec. 5214 at 269 ("The prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence."). Also relevant are the nature of the witness's narrative; the likelihood that the testimony is true; the sufficiency of the other evidence presented to make a reasonable connection between the defendant and the offense charged; and the extent to which any possible inflaming of the jury can be cured by limiting instructions. Guerrero, 803 F.2d at 786.
 
 
 16
 Although the record in this case does not reveal express consideration of these factors by the district court, we are convinced that the district court did not abuse its discretion in admitting Vega's testimony. As noted above, if credited, the evidence of threats in this case reflects more than a "generalized distaste for the courtroom," see Monahan, 633 F.2d at 985, and is therefore highly probative of Taylor's consciousness of guilt. Moreover, the prosecution did not dwell on the threat evidence, even omitting all reference to it on closing argument. See United States v. Burton, 525 F.2d 17, 19 (2d Cir.1975) (harmless error to admit threat evidence when, inter alia, it was "passed over quickly"). Finally, Vega's account of the threat was not particularly provocative, tending intrinsically to incite the jurors' passions, and the district court proffered a careful jury instruction, explaining that evidence of threats against a witness may be considered to show consciousness of guilt, but is not alone sufficient to prove guilt. See Guerrero, 803 F.2d at 787 (noting that non-provocative nature of testimony and limiting instruction "would tend to limit any possible prejudice").
 
 III
 
 17
 Taylor's next challenge is more troublesome. He contends that the district court should have disallowed the government's evidence of the stun gun found in his car because the government failed before trial to reveal the stun gun, or in any way indicate its expected use as evidence, despite Taylor's discovery request pursuant to Federal Rule of Criminal Procedure 16(a)(1)(C), and because the probative value of the evidence is substantially outweighed by its unfairly prejudicial impact. We think both arguments have merit, but are persuaded on a review of the record that, even if the evidence was erroneously admitted, the error was harmless in that it is highly probable that it did not affect the ultimate judgment in the case. See United States v. Nyman, 649 F.2d 208, 211-12 (4th Cir.1980). The decisive factors in determining harmlessness of error in the admission or exclusion of evidence are " 'the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.' " Nyman, 649 F.2d at 212 (quoting Gaither v. United States, 413 F.2d 1061, 1079 (D.C.Cir.1969)). In this case, of course, no steps were taken to mitigate the error because none was perceived. Consideration of the other two factors persuades us, however, that it is highly probable that any error in admitting this evidence did not affect the jury's ultimate determination of guilt in this case. Nyman, 649 F.2d at 211-12. The case was simply not one so close on the evidence that the admission of this item of impeaching evidence on a collateral issue is likely to have "swayed" the judgment. Kotteakos v. United States, 328 U.S. 750, 765 (1946); cf. Nyman, 649 F.2d at 211-12 (exclusion of evidence impeaching identifying witnesses not harmless where defendant's identification "was essentially the only controverted issue in the case," and lengthy jury deliberations suggested closeness of case).
 
 IV
 
 18
 Taylor's final challenge is to the district court's two-level enhancement of his sentence under Sec. 3C1.1 of the Federal Sentencing Guidelines. He does not dispute the district court's authority to make such an enhancement under the section if it finds that the defendant "willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the [case]" by, inter alia "threatening, intimidating, or otherwise unlawfully attempting to influence a co-defendant, witness, or juror, directly or indirectly." Guideline Sec. 3C1.1 & Application Note 1(d). Rather, he contends that Vega's testimony is inadequate to support a finding that Taylor threatened him because (1) Application Note 2 provides that "suspect testimony ... should be evaluated in a light most favorable to the defendant" and (2) it failed to meet the "clear and convincing" evidentiary standard that he claims is necessary for enhancement under the Guidelines. Both contentions are without merit.
 
 
 19
 First, although Application Note 2 instructs the sentencing court to evaluate "suspect" testimony favorably to the defendant, it cannot mean that the court must treat as suspect all testimony whose trustworthiness might be questioned on extrinsic grounds such as the fact here that the witness was testifying as part of a plea agreement and possibly had independent reasons for testifying falsely. Rather, "suspect testimony" must refer to situations in which there are more intrinsic bases for questioning its trustworthiness such as internal contradiction or inconsistency or concessions of uncertainty. The mere fact that particular testimony is in conflict with that of others cannot make it suspect in the Guideline sense.
 
 
 20
 In any event determining whether certain testimony is "suspect," based on either credibility assessments or other factors is essentially a factual finding, cf. United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989) (whether defendant is a "minimal" or "minor" crime participant within the meaning of the Guidelines is an "essentially factual" question). On such determinations we defer to the district court's determination unless it is clearly erroneous. Id. at 217 (citing 18 U.S.C. Sec. 3742(e)). Although the court here did not expressly consider whether Vega's testimony was suspect and therefore should have been construed favorably to Taylor, the government alerted the court to this provision during the sentencing hearing, see Sentencing Hearing Transcript, No. 88-224 A, at 11 (E.D.Va. January 27, 1989), and the court implicitly found Vega's testimony more credible by specifically finding that Taylor threatened Vega. Id. at 13-14. On the sentencing record this determination, largely one of credibility, is not clearly erroneous. See 18 U.S.C. Sec. 3742(e) ("The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses....").
 
 
 21
 Finally, the threat evidence in this case sufficiently met the evidentiary standard to uphold enhancement under the Guidelines. Even though the threats recounted by Vega may have lacked specificity, they were persistent, directed and apparently credited by the court at the sentencing phase when it found that they had indeed occurred. Based on the record before us, this conclusion is not clearly erroneous and enhancement was therefore warranted. See United States v. Brett, 872 F.2d 1365, 1371 (8th Cir.1989) (enhancement under Sec. 3C1.1 mandatory when court finds defendant obstructed justice); United States v. Roberson, 872 F.2d 597, 609 (5th Cir.1989) (same).
 
 V
 
 22
 For all the foregoing reasons, we affirm.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 At trial, the parties stipulated that Vega was carrying 495.26 grams of a mixture, of which 80 percent was cocaine
 
 
 [2]
 "Stun gun" refers to a device that emits an electrical charge which temporarily "stuns" (incapacitates) a living target. While there are various types, with differing degrees of effectiveness, see United States v. Wallace, 800 F.2d 1509, 1512-13 (9th Cir.1986), the record does not reflect which type was found here
 
 
 [3]
 The prosecution indicated for the first time during Vega's direct examination that it intended to question him about the stun gun. The prosecution explained that the gun had not been provided to the defense during discovery because it only recently had come into the government's possession, having been obtained and kept until the week before trial by the Metropolitan Washington Airport Authority. The district court sustained Taylor's objection to the admission of direct testimony concerning the weapon, but stated that it might be allowed if Taylor testified. As indicated above, evidence concerning the gun was allowed to impeach Taylor's testimony. An officer of the Airport Authority testified that he impounded the 1979 grey 4-door Dodge with temporary license plates because it appeared abandoned and, during a routine inventory search, discovered a stun gun inside it. Vega was recalled to the stand and testified that, on the way to the preliminary hearing, Taylor told him that he had a gun in his car at the airport. Vega also testified that Taylor drives an old, grey 4-door Ford with temporary license plates, which he had seen at Dickey's house
 
 
 [4]
 Although Taylor characterizes this issue as one implicating his due process guarantees, asserting that "due process mandates that the government and the trial court desist from introducing and admitting, respectively, evidence which inflames the jury without providing facts helpful in resolving the issue of guilt or innocence," Appellant's Brief at 6, we treat it, more properly, as a direct attack on the relevance to a matter other than Taylor's character and the relative probativity of the admitted evidence