17 F.3d 1435
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Malcolm Guy GLASGOW, a/k/a UT, Defendant-Appellant.
 No. 92-5522.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 1, 1993.
Decided: Feb. 9, 1994.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern; Terrence W. Boyle, District Judge. (CR-91-92-BO)
 George Alan DuBois, Jr., Asst. Federal Public Defender, Raleigh, NC, for appellant.
 David Paul Folmar, Jr., Asst. U.S. Atty., Raleigh, NC, for appellee.
 Margaret Person Currin, U.S. Atty., Raleigh, NC, for appellee.
 E.D.N.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and SPROUSE, Senior Circuit Judge.
 
 OPINION
 PHILLIPS
 
 1
 Malcolm G. Glasgow appeals from his conviction and sentence on several charges relating to the distribution of cocaine base ("crack"). He challenges his conviction on the basis that the district court abused its discretion by admitting, under Rule 404(b), Fed.R.Evid., evidence of his prior involvement with the possession and distribution of drugs. He contests the inclusion of 2.4 grams of cocaine in determining his relevant conduct for sentencing purposes.
 
 
 2
 We conclude that if the district court erred in admitting the 404(b) evidence, the error was harmless, and therefore affirm the conviction. Because we conclude that the district court's calculation of the amount of drugs attributable to Glasgow for purposes of determining his relevant conduct was not clearly erroneous, we also affirm the sentence.
 
 
 3
 * In March 1991, in New Bern, North Carolina, a state undercover police officer, Detective Donald Hines, began purchasing crack from Enerva Trotman, a/k/a Charles Carlos Clark. Trotman sold Hines .5 grams of crack on March 15th; . 7 grams on the 22nd, and 1.2 grams on the 29th.
 
 
 4
 In early April, Detective Hines began negotiating by phone with Trotman to purchase larger amounts of crack. During these conversations, Trotman intimated that his drug supplier lived in Havelock, North Carolina. On April 9th, Hines picked up Trotman at the Craven Terrace Apartments in New Bern, and the pair traveled to Havelock. During the drive, Trotman told Detective Hines that his drug source was named "UT".
 
 
 5
 Trotman also informed Hines that UT lived in Havelock, that he (Trotman) would have to go to UT's house in order to procure the crack, and that Hines would have to park out of sight of UT's house because he (UT) did not like meeting people. Upon arriving in Havelock, Trotman directed Hines to drive to a Jim Dandy convenience store on Miller Boulevard. From there, Trotman alone walked to a nearby house. In ten minutes he returned empty handed and explained to Hines that UT was not at home. Instead, they would have to drive to a store apparently owned by UT.
 
 
 6
 At the store, a woman told Trotman that UT was in New Bern. Trotman and Hines thus returned to that city. As they neared Craven Terrace, Trotman saw UT and told Hines to stop the car. Trotman got out, and there within the sight, but not the hearing, of Detective Hines, he and UT had a short conversation. At trial, Hines identified Malcolm Glasgow as the person with whom he saw Trotman conversing on that occasion.
 
 
 7
 Upon rejoining Hines, Trotman informed him that they would have to go once again to Havelock. While on the highway, Hines, after being alerted by Trotman that UT's car was about to pass, saw UT pass, driving a silver Nissan.
 
 
 8
 Again Hines passed time at the Jim Dandy store while Trotman walked down Miller Boulevard. In five minutes Trotman returned and informed Hines that UT would be arriving shortly. Nearly a half hour later, Detective Hines saw the silver Nissan pull into the driveway of 403 Miller Boulevard. Trotman again walked towards the house. As he did so, the silver Nissan pulled out of the driveway and headed in his direction. The car stopped, and let Trotman in. Detective Hines could not tell who was driving the car. Other officers conducting surveillance testified at trial that Glasgow was at the wheel.
 
 
 9
 Hines saw the silver Nissan return to 403 Miller Boulevard. At some later point, Trotman rejoined Detective Hines at the Jim Dandy store, and sold him 26.8 grams of crack. According to the officers conducting surveillance, sometime after the deal was completed they observed Trotman and Glasgow in the silver Nissan heading out of Havelock towards New Bern.
 
 
 10
 On May 3, 1991, Trotman and undercover agent Hines met again at the Jim Dandy store in Havelock for what would be their final drug transaction. Trotman told Hines that they would have to wait for UT. After a half hour passed with no sign of UT, Trotman and Hines left the Jim Dandy in search of UT and food. Finding only the latter, they returned to the Jim Dandy. Ten minutes later, the silver Nissan drove into the driveway of 403 Miller Boulevard. Eventually, Trotman walked alone to the house and returned with 21.1 grams of crack which he sold to Hines.
 
 
 11
 Approximately ten minutes after the deal was completed, an officer conducting surveillance saw Glasgow sitting on the front porch of 403 Miller Boulevard.
 
 
 12
 Six months after these events, Glasgow and Trotman were named as co-defendants in a seven-count indictment involving the distribution of drugs in Eastern North Carolina during the spring of 1991. Trotman was charged with all seven counts, Glasgow with four. At the time of Glasgow's trial, Trotman was a fugitive.
 
 
 13
 After one of the four counts was dismissed by the Government before trial,[1] Glasgow was tried on the remaining three: conspiring to distribute cocaine base ("crack") in violation of 21 U.S.C. Sec. 846 and two counts of distribution of crack, and aiding and abetting distribution in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2.
 
 
 14
 At trial, the Government's evidence consisted of testimony by Detective Hines and other undercover surveillance officers relating the events described above. In addition to the officers, a real estate agent testified that the house where Trotman went to procure the drugs he ultimately sold to Hines was leased to a man named Evangelino Brooks and that Glasgow and a woman were listed as additional tenants.
 
 
 15
 The Government concluded its case in chief with two witnesses whose testimony consisted only of other "bad acts" evidence that was admitted over objection under Fed.R.Evid. 404(b).
 
 
 16
 First, William Lovick testified that he purchased marijuana and powder cocaine directly from Glasgow roughly a dozen times between 1988 and 1991. Some of these transactions occurred during approximately the same time period as the offenses for which Glasgow stood trial but none involved either persons or drugs of the type involved in the charged transactions.
 
 
 17
 Second, Officer Derick Tisdale of the New Bern Police Department testified that in 1988, he had executed a search warrant at an apartment in New Bern where Glasgow was living and found seven grams of cocaine powder and a large quantity of marijuana. He further testified that Glasgow pled guilty in superior court to two charges stemming from this search: possession of cocaine with intent to distribute, and maintaining a dwelling for use in the sale of narcotics.
 
 
 18
 In admitting these two items of "bad acts" evidence, the district court accepted the Government's contention that each was necessary to prove that Glasgow had the requisite "intent" to be found guilty of the crimes charged. The court later gave a limiting instruction to the jury that the evidence could not be considered as proof of any propensity to engage in drug trafficking, but only to prove his intent to commit the offense with which he was charged.
 
 
 19
 Glasgow put on no evidence in his defense, and was convicted by the jury on all counts.
 
 
 20
 At Glasgow's sentencing hearing, the district court found, in accordance with the presentence report, that the amount of cocaine base attributable to Glasgow under the relevant conduct provisions of the Sentencing Guidelines was 50.3 grams. Based on this amount, Glasgow was sentenced to 135 months in prison followed by a 60-month term of supervised release.
 
 
 21
 This appeal followed.
 
 II
 
 22
 We first consider the claim of error in admitting the evidence of "other bad acts" under Fed.R.Evid. 404(b). Under that Rule:
 
 
 23
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 24
 We have carefully considered this claim of error as one of arguable merit respecting a troublesome, recurring problem in cases reaching this court in recent times; that of the admission of evidence proffered by the Government, in its case-in-chief, of "other bad acts" comparable to, but unconnected with, the offense charged (particularly as here, drug-trafficking offenses) to prove "intent." Glasgow argues forcefully that the admission of that here should be found erroneous, in line with our recent decision in the closely-related case of United States v. Hernandez, 975 F.2d 1035 (4th Cir.1992). Specifically, he contends that as and when proffered here the 404(b) evidence of earlier drug transactions in which he was said to be involved was neither sufficiently relevant nor necessary to prove his intent to meet this court's "relevant, necessary and reliable" requirement for 404(b) admissibility, see Hernandez, 975 F.2d at 1039. And he further contends that in any event such relevance and necessity as it may have had was "substantially outweighed" by the dangers of unfair prejudice, confusion, or misleading required to be weighed in the balance by Fed.R.Evid. 403.
 
 
 25
 As indicated, these contentions are serious ones on the facts of this case. While the facts can be distinguished from those in Hernandez, so can they be from the facts in any of the cases upholding admissibility that are relied upon by the Government. By its nature, this evidentiary issue is one not too susceptible to resolution by direct precedent.
 
 
 26
 Here, we think the difficult effort that would be required to determine in this close case whether, within our precedents (or within a permissible clarification of those precedents) error was committed is not warranted, for we are satisfied that any committed was harmless under the appropriate test. That test--for non-constitutional error--is "whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Nyman, 649 F.2d 208, 211-12 (4th Cir.1980) ( quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). One of the decisive factors in applying this standard is the closeness of the case. Id. at 212. See also, Hernandez, 975 F.2d at 1041 ("In considering the harmlessness of the error, it is proper to consider other evidence of the defendant's guilt.").
 
 
 27
 The analysis here under these tests is a simple one. Although the Government's case was based on circumstantial evidence, that evidence was substantial and there are no indications in the record that for the jury this was a close case of factual guilt beyond a reasonable doubt. The evidence presented to the jury included the testimony of an officer that Trotman told him his supplier was"UT", and that "UT" lived in Havelock; the testimony of several officers that they knew "UT" to be an alias used by Glasgow; the testimony of an officer that Trotman identified Glasgow's house as belonging to"UT"; the testimony of several officers who conducted surveillance during the drug transactions that they saw Trotman talking to Glasgow, saw Glasgow drive to his home, saw Trotman and the undercover officer park near Glasgow's home, saw Trotman go back and forth to Glasgow's home, and saw Trotman in Glasgow's car after one of the transactions was completed; the testimony of an officer that he received drugs on two occasions a short time after Trotman went to Glasgow's home; and the testimony of eyewitnesses that Glasgow was seen immediately after both of the April transactions in the immediate vicinity of their occurrence.
 
 
 28
 On this state of the record we cannot conclude that the jury's verdict was substantially swayed by the challenged"other bad acts" evidence.
 
 III
 
 29
 We next consider Glasgow's challenge to the sentence imposed.
 
 
 30
 The sentencing judge (who was not the trial judge), following the recommendation of the presentence report, found the amount of cocaine base attributable to Glasgow to be 50.3 grams. Glasgow raises no objection to 47.9 grams--the amount involved in the two sales by Trotman to the undercover officer on April 19 and May 3, 1991 for which Glasgow was convicted of being the supplier, but challenges inclusion of the 2.4 grams involved in the three earlier sales of cocaine base by Trotman to the undercover officer in March of 1991. He points out that no evidence connects him directly with those sales. The inclusion of the 2.4 grams was significant because it pushed Glasgow's total relevant conduct amount over 50 grams, resulting in a two-level increase in his base offense level from 30 to 32 and subjecting him to the 10-year mandatory minimum sentence under 21 U.S.C. Sec. 841(b)(1)(A).
 
 
 31
 As a preliminary matter, we must address the Government's claim that the defendant failed to object to the 50.3 grams recommendation in the presentence report. If the defendant failed to raise a satisfactory objection (either in writing or orally during the sentencing hearing itself), and the report displays a modicum of reliability, the Government's burden is met. United States v. Gilliam, 987 F.2d 1009, 1013 (4th Cir.1993). "A mere objection to the finding in the presentence report is not sufficient"; the defendant has an affirmative duty to show that the information in the report is unreliable, untrue or inaccurate. United States v. Terry, 916 F.2d 157, 162 (4th Cir.1990).
 
 
 32
 We believe that Glasgow's counsel's objections to the 2.4 grams included in the presentence report were sufficient, albeit barely so, under the standard enunciated in Terry. During the sentencing hearing, defense counsel pointed out on several occasions that Glasgow had no involvement in, was not indicted for, and should not be held responsible for, any of the March sales. Therefore, Glasgow's counsel argued, the amount of drugs attributable to defendant was less than 50 grams. Although defense counsel never explicitly said so, by repeatedly arguing that the attributable amount was less than 50 grams he appeared to be contending that the 50.3 grams figure in the presentence report was "inaccurate". We therefore believe the issue was properly preserved for review, and turn to Glasgow's claims that both the procedure used by the district court to arrive at the correct attributable amount, and its conclusion as to the amount were erroneous.
 
 
 33
 In response to each objection a defendant raises to facts contained in a presentence report, the district court must make a finding before it can rely on the disputed fact in sentencing. Fed.R.Crim.P. 32(c)(3)(D). See also, United States v. Morgan, 942 F.2d 243 (4th Cir.1991). Here, the finding was cursory. But like the defendant's objection to the presentence report, the court's finding seems sufficient.
 
 
 34
 After the defendant's initial objection to the 2.4 grams,[2] the court prodded the Government to explain how it arrived at the 50-grams-plus amount (which included the 2.4 grams). The Government responded that the inclusion of the small amounts sold during the March deals was premised on the fact that in early April Trotman indicated that his crack supplier was Glasgow. This was confirmed by Detective Hines' trial testimony that Trotman told him in early April that UT was Trotman's "distributor."
 
 
 35
 The sentencing judge concluded that the 2.4 grams could be attributed to Glasgow under the "relevant conduct" provision of the Sentencing Guidelines, Sec. 1B1.3(a)(1)(B), applicable to "jointly undertaken criminal activity" such as the conspiracy charged here. Under that provision, Glasgow properly could be held accountable for all amounts of drugs distributed by other members of the proven conspiracy that were reasonably foreseeable to him and that were distributed in furtherance of activity jointly undertaken with him. Application Note 2, Commentary to Sec. 1B1.3. The Government's burden to establish amounts properly attributable under this provision is by a preponderance of the evidence. United States v. Mark, 943 F.2d 444, 450 (4th Cir.1991), and the court's determination of the amounts attributable is a finding of fact which we must affirm unless it is clearly erroneous. Id.
 
 
 36
 Reviewing the determination to attribute the 2.4 grams to Glasgow as "relevant conduct" under this Guideline provision, we cannot hold it clearly erroneous. Before the court at sentencing was the evidence upon which the jury had convicted Glasgow of conspiring with Trotman to distribute crack cocaine over a period from March 15, 1991 to May 3, 1991. There was then evidence that Trotman had made three sales of crack totalling this amount to an undercover agent in March of 1991, and that in April of 1991, per the testimony of Detective Hines, Trotman had told him that Glasgow was his, Trotman's, supplier. Accepting the credibility of this testimony, as the district court was entitled to do, the court could rationally infer from it that Glasgow was the supplier of the 2.4 grams to Trotman, hence that Trotman's re-sale was foreseeable to Glasgow and was in furtherance of their jointly undertaken activity in which Glasgow acted as supplier and Trotman as retail distributor. The finding to that effect cannot be declared clearly erroneous, and the sentence based upon it is not subject on that account to reversal.
 
 
 37
 Accordingly, we affirm the sentence.
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 The dismissed count involved the use of a firearm during a drug trafficking offense in violation of 18 U.S.C. Sec. 924(c)
 
 
 [2]
 Defense counsel actually objected to the attribution of 2.7 grams involved in counts against Trotman. J.A. 231. The discrepancy--likely due to the presentence report's use of both "approximately 1 gram" and .7 grams to describe the amount of cocaine at issue in Count Three--is insignificant since either amount (2.4 or 2.7 grams) is sufficient to raise Glasgow's total above the 50.0 grams threshold